Justice ALITO delivered the opinion of the Court.
*1963 We consider in this case whether to overrule a longstanding interpretation of the Double Jeopardy Clause of the Fifth Amendment. That Clause provides that no person may be "twice put in jeopardy" "for *1964 the same offence." Our double jeopardy case law is complex, but at its core, the Clause means that those acquitted or convicted of a particular "offence" cannot be tried a second time for the same "offence." But what does the Clause mean by an "offence"?
We have long held that a crime under one sovereign's laws is not "the same offence" as a crime under the laws of another sovereign. Under this "dual-sovereignty" doctrine, a State may prosecute a defendant under state law even if the Federal Government has prosecuted him for the same conduct under a federal statute.
Or the reverse may happen, as it did here. Terance Gamble, convicted by Alabama for possessing a firearm as a felon, now faces prosecution by the United States under its own felon-in-possession law. Attacking this second prosecution on double jeopardy grounds, Gamble asks us to overrule the dual-sovereignty doctrine. He contends that it departs from the founding-era understanding of the right enshrined by the Double Jeopardy Clause. But the historical evidence assembled by Gamble is feeble; pointing the other way are the Clause's text, other historical evidence, and 170 years of precedent. Today we affirm that precedent, and with it the decision below.
I
In November 2015, a local police officer in Mobile, Alabama, pulled Gamble over for a damaged headlight. Smelling marijuana, the officer searched Gamble's car, where he found a loaded 9-mm handgun. Since Gamble had been convicted of second-degree robbery, his possession of the handgun violated an Alabama law providing that no one convicted of "a crime of violence" "shall own a firearm or have one in his or her possession." Ala. Code § 13A-11-72(a) (2015) ; see § 13A-11-70(2) (defining "crime of violence" to include robbery). After Gamble pleaded guilty to this state offense, federal prosecutors indicted him for the same instance of possession under a federal law-one forbidding those convicted of "a crime punishable by imprisonment for a term exceeding one year ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1).
Gamble moved to dismiss on one ground: The federal indictment was for "the same offence" as the one at issue in his state conviction and thus exposed him to double jeopardy. But because this Court has long held that two offenses "are not the 'same offence' " for double jeopardy purposes if "prosecuted by different sovereigns," Heath v. Alabama , 474 U.S. 82, 92, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985), the District Court denied Gamble's motion to dismiss. Gamble then pleaded guilty to the federal offense while preserving his right to challenge the denial of his motion to dismiss on double jeopardy grounds. But on appeal the Eleventh Circuit affirmed, citing the dual-sovereignty doctrine. 694 Fed. Appx. 750 (2017). We granted certiorari to determine whether to overturn that doctrine.[1] 585 U.S. ----, 138 S.Ct. 2707, 201 L.Ed.2d 1095 (2018).
II
Gamble contends that the Double Jeopardy Clause must forbid successive prosecutions by different sovereigns because that is what the founding-era common law *1965 did. But before turning to that historical claim, see Part III infra , we review the Clause's text and some of the cases Gamble asks us to overturn.
A
We start with the text of the Fifth Amendment. Although the dual-sovereignty rule is often dubbed an "exception" to the double jeopardy right, it is not an exception at all. On the contrary, it follows from the text that defines that right in the first place. "[T]he language of the Clause ... protects individuals from being twice put in jeopardy 'for the same offence ,' not for the same conduct or actions ," Grady v. Corbin , 495 U.S. 508, 529, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), as Justice Scalia wrote in a soon-vindicated dissent, see United States v. Dixon , 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (overruling Grady ). And the term " '[o]ffence' was commonly understood in 1791 to mean 'transgression,' that is, 'the Violation or Breaking of a Law.' " Grady , 495 U.S. at 529, 110 S.Ct. 2084 (Scalia, J., dissenting) (quoting Dictionarium Britannicum (Bailey ed. 1730)). See also 2 R. Burn & J. Burn, A New Law Dictionary 167 (1792) ("OFFENCE, is an act committed against law, or omitted where the law requires it"). As originally understood, then, an "offence" is defined by a law, and each law is defined by a sovereign. So where there are two sovereigns, there are two laws, and two "offences." See Grady , 495 U.S. at 529, 110 S.Ct. 2084 (Scalia, J., dissenting) ("If the same conduct violates two (or more) laws, then each offense may be separately prosecuted"); Moore v. Illinois , 14 How. 13, 17, 14 L.Ed. 306 (1852) ("The constitutional provision is not, that no person shall be subject, for the same act, to be twice put in jeopardy of life or limb; but for the same offence , the same violation of law , no person's life or limb shall be twice put in jeopardy" (emphasis added)).
Faced with this reading, Gamble falls back on an episode from the Double Jeopardy Clause's drafting history.[2] The first Congress, working on an earlier draft that would have banned " 'more than one trial or one punishment for the same offence,' " voted down a proposal to add " 'by any law of the United States.' " 1 Annals of Cong. 753 (1789). In rejecting this addition, Gamble surmises, Congress must have intended to bar successive prosecutions regardless of the sovereign bringing the charge.
Even if that inference were justified-something that the Government disputes-it would count for little. The private intent behind a drafter's rejection of one version of a text is shoddy evidence of the public meaning of an altogether different text. Cf. United States v. Craft , 535 U.S. 274, 287, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) ("[F]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute" (internal quotation marks omitted)).
Besides, if we allowed conjectures about purpose to inform our reading of the text, the Government's conjecture would prevail. The Government notes that the Declaration *1966 of Independence denounced King George III for "protecting [British troops] by a mock Trial, from punishment for any Murders which they should commit on the Inhabitants of these States." ¶ 17. The Declaration was alluding to "the so-called Murderers' Act, passed by Parliament after the Boston Massacre," Amar, Sixth Amendment First Principles, 84 Geo. L. J. 641, 687, n. 181 (1996), a law that allowed British officials indicted for murder in America to be " 'tried in England, beyond the control of local juries.' " Ibid. (quoting J. Blum et al., The National Experience 95 (3d ed. 1973)). "During the late colonial period, Americans strongly objected to ... [t]his circumvention of the judgment of the victimized community." Amar, 84 Geo. L. Rev., at 687, n. 181. Yet on Gamble's reading, the same Founders who quite literally revolted against the use of acquittals abroad to bar criminal prosecutions here would soon give us an Amendment allowing foreign acquittals to spare domestic criminals. We doubt it.
We see no reason to abandon the sovereign-specific reading of the phrase "same offence," from which the dual-sovereignty rule immediately follows.
B
Our cases reflect the same reading. A close look at them reveals how fidelity to the Double Jeopardy Clause's text does more than honor the formal difference between two distinct criminal codes. It honors the substantive differences between the interests that two sovereigns can have in punishing the same act.
The question of successive federal and state prosecutions arose in three antebellum cases implying and then spelling out the dual-sovereignty doctrine. The first, Fox v. Ohio , 5 How. 410, 12 L.Ed. 213 (1847), involved an Ohio prosecution for the passing of counterfeit coins. The defendant argued that since Congress can punish counterfeiting, the States must be barred from doing so, or else a person could face two trials for the same offense, contrary to the Fifth Amendment. We rejected the defendant's premise that under the Double Jeopardy Clause "offences falling within the competency of different authorities to restrain or punish them would not properly be subjected to the consequences which those authorities might ordain and affix to their perpetration." Id. , at 435. Indeed, we observed, the nature of the crime or its effects on "public safety" might well "deman[d]" separate prosecutions. Ibid. Generalizing from this point, we declared in a second case that "the same act might, as to its character and tendencies, and the consequences it involved, constitute an offence against both the State and Federal governments, and might draw to its commission the penalties denounced by either, as appropriate to its character in reference to each." United States v. Marigold , 9 How. 560, 569, 13 L.Ed. 257 (1850).
A third antebellum case, Moore v. Illinois , 14 How. 13, 55 U.S. 13, 14 L.Ed. 306, expanded on this concern for the different interests of separate sovereigns, after tracing it to the text in the manner set forth above. Recalling that the Fifth Amendment prohibits double jeopardy not "for the same ac[t]" but "for the same offence," and that "[a]n offence, in its legal signification, means the transgression of a law," id. , at 19, we drew the now-familiar inference: A single act "may be an offence or transgression of the laws of" two sovereigns, and hence punishable by both, id., at 20. Then we gave color to this abstract principle-and to the diverse interests it might vindicate-with an example. An assault on a United States marshal, we said, would offend against the Nation and a State: the first by "hindering" the "execution *1967 of legal process," and the second by "breach[ing]" the "peace of the State." Ibid. That duality of harm explains how "one act" could constitute "two offences, for each of which [the offender] is justly punishable." Ibid.
This principle comes into still sharper relief when we consider a prosecution in this country for crimes committed abroad. If, as Gamble suggests, only one sovereign may prosecute for a single act, no American court-state or federal-could prosecute conduct already tried in a foreign court. Imagine, for example, that a U.S. national has been murdered in another country. That country could rightfully seek to punish the killer for committing an act of violence within its territory. The foreign country's interest lies in protecting the peace in that territory rather than protecting the American specifically. But the United States looks at the same conduct and sees an act of violence against one of its nationals, a person under the particular protection of its laws. The murder of a U.S. national is an offense to the United States as much as it is to the country where the murder occurred and to which the victim is a stranger. That is why the killing of an American abroad is a federal offense that can be prosecuted in our courts, see 18 U.S.C. § 2332(a)(1), and why customary international law allows this exercise of jurisdiction.
There are other reasons not to offload all prosecutions for crimes involving Americans abroad. We may lack confidence in the competence or honesty of the other country's legal system. Less cynically, we may think that special protection for U.S. nationals serves key national interests related to security, trade, commerce, or scholarship. Such interests might also give us a stake in punishing crimes committed by U.S. nationals abroad-especially crimes that might do harm to our national security or foreign relations. See, e.g. , § 2332a(b) (bombings). These examples reinforce the foundation laid in our antebellum cases: that a crime against two sovereigns constitutes two offenses because each sovereign has an interest to vindicate.
We cemented that foundation 70 years after the last of those antebellum cases, in a decision upholding a federal prosecution that followed one by a State. See United States v. Lanza , 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922) ("[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each"). And for decades more, we applied our precedent without qualm or quibble. See, e.g. , Screws v. United States , 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) ; Jerome v. United States , 318 U.S. 101, 63 S.Ct. 483, 87 L.Ed. 640 (1943) ; Puerto Rico v. Shell Co. (P. R.), Ltd. , 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937) ; Westfall v. United States , 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036 (1927) ; Hebert v. Louisiana , 272 U.S. 312, 47 S.Ct. 103, 71 L.Ed. 270 (1926). When petitioners in 1959 asked us twice to reverse course, we twice refused, finding "[n]o consideration or persuasive reason not presented to the Court in the prior cases" for disturbing our "firmly established" doctrine. Abbate v. United States , 359 U.S. 187, 195, 79 S.Ct. 666, 3 L.Ed.2d 729 ; see also Bartkus v. Illinois , 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684. And then we went on enforcing it, adding another six decades of cases to the doctrine's history. See, e.g. , Puerto Ricov.Sánchez Valle , 579 U.S. ----, 136 S.Ct. 1863, 195 L.Ed.2d 179 (2016) ; Heath v. Alabama , 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) ; United States v. Wheeler , 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) ; Rinaldi v. United States , 434 U.S. 22, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977) ( per curiam ).
*1968 C
We briefly address two objections to this analysis.
First, the dissents contend that our dual-sovereignty rule errs in treating the Federal and State Governments as two separate sovereigns when in fact sovereignty belongs to the people. See post , at 1990 (opinion of GINSBURG, J.); post , at 1999 (opinion of GORSUCH, J.). This argument is based on a non sequitur. Yes, our Constitution rests on the principle that the people are sovereign, but that does not mean that they have conferred all the attributes of sovereignty on a single government. Instead, the people, by adopting the Constitution, " 'split the atom of sovereignty.' " Alden v. Maine , 527 U.S. 706, 751, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (alteration omitted) (internal quotation marks and citation omitted). As we explained last Term:
"When the original States declared their independence, they claimed the powers inherent in sovereignty .... The Constitution limited but did not abolish the sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.' The Federalist No. 39, p. 245 (C. Rossiter ed. 1961). Thus, both the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of 'dual sovereignty.' Gregory v. Ashcroft, 501 U.S. 452, 457 [111 S.Ct. 2395, 115 L.Ed.2d 410] (1991)." Murphy v. National Collegiate Athletic Assn. , 584 U.S. ----, ----, 138 S.Ct. 1461, 1475, 200 L.Ed.2d 854 (2018).
It is true that the Republic is " 'ONE WHOLE,' " post , at 1990 (opinion of GINSBURG, J.) (quoting The Federalist No. 82, p. 493 (C. Rossiter ed. 1961) (A. Hamilton)); accord, post, at 1999 (opinion of GORSUCH, J.). But there is a difference between the whole and a single part, and that difference underlies decisions as foundational to our legal system as McCulloch v. Maryland , 4 Wheat. 316, 4 L.Ed. 579 (1819). There, in terms so directly relevant as to seem presciently tailored to answer this very objection, Chief Justice Marshall distinguished precisely between "the people of a State" and "[t]he people of all the States," id., at 428, 435 ; between the "sovereignty which the people of a single state possess" and the sovereign powers "conferred by the people of the United States on the government of the Union," id., at 429-430 ; and thus between "the action of a part" and "the action of the whole," id., at 435-436. In short, McCulloch 's famous holding that a State may not tax the national bank rested on a recognition that the States and the Nation have different "interests" and "right[s]." Id. , 431, 436. One strains to imagine a clearer statement of the premises of our dual-sovereignty rule, or a more authoritative source. The United States is a federal republic; it is not, contrary to Justice GORSUCH's suggestion, post , at 2001 - 2002, a unitary state like the United Kingdom.
Gamble and the dissents lodge a second objection to this line of reasoning. They suggest that because the division of federal and state power was meant to promote liberty, it cannot support a rule that exposes Gamble to a second sentence. See post , at 1990 - 1991 (opinion of GINSBURG, J.); post, at 1999 - 2000 (opinion of GORSUCH, J.). This argument fundamentally misunderstands the governmental structure established by our Constitution. Our federal system advances individual liberty in many ways. Among other things, it limits the powers of the Federal Government and protects certain basic liberties from infringement. But because the powers of the Federal Government and the States often overlap, allowing both to regulate *1969 often results in two layers of regulation. Taxation is an example that comes immediately to mind. It is also not at all uncommon for the Federal Government to permit activities that a State chooses to forbid or heavily restrict-for example, gambling and the sale of alcohol. And a State may choose to legalize an activity that federal law prohibits, such as the sale of marijuana. So while our system of federalism is fundamental to the protection of liberty, it does not always maximize individual liberty at the expense of other interests. And it is thus quite extraordinary to say that the venerable dual-sovereignty doctrine represents a " 'desecrat[ion]' " of federalism. Post , at 2000 (opinion of GORSUCH, J.).
III
Gamble claims that our precedent contradicts the common-law rights that the Double Jeopardy Clause was originally understood to engraft onto the Constitution-rights stemming from the "common-law pleas of auterfoits acquit [former acquittal] and auterfoits convict [former conviction]." Grady , 495 U.S. at 530, 110 S.Ct. 2084 (Scalia, J., dissenting). These pleas were treated as "reason[s] why the prisoner ought not to answer [an indictment] at all, nor put himself upon his trial for the crime alleged." 4 W. Blackstone, Commentaries on the Laws of England 335 (1773) (Blackstone). Gamble argues that those who ratified the Fifth Amendment understood these common-law principles (which the Amendment constitutionalized) to bar a domestic prosecution following one by a foreign nation. For support, he appeals to early English and American cases and treatises. We have highlighted one hurdle to Gamble's reading: the sovereign-specific original meaning of "offence." But the doctrine of stare decisis is another obstacle.
Stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee , 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Of course, it is also important to be right, especially on constitutional matters, where Congress cannot override our errors by ordinary legislation. But even in constitutional cases, a departure from precedent "demands special justification." Arizona v. Rumsey , 467 U.S. 203, 212, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984). This means that something more than "ambiguous historical evidence" is required before we will "flatly overrule a number of major decisions of this Court." Welch v. Texas Dept. of Highways and Public Transp. , 483 U.S. 468, 479, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). And the strength of the case for adhering to such decisions grows in proportion to their "antiquity." Montejo v. Louisiana , 556 U.S. 778, 792, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009). Here, as noted, Gamble's historical arguments must overcome numerous "major decisions of this Court" spanning 170 years . In light of these factors, Gamble's historical evidence must, at a minimum, be better than middling.
And it is not. The English cases are a muddle. Treatises offer spotty support. And early state and federal cases are by turns equivocal and downright harmful to Gamble's position. All told, this evidence does not establish that those who ratified the Fifth Amendment took it to bar successive prosecutions under different sovereigns' laws-much less do so with enough force to break a chain of precedent linking dozens of cases over 170 years.
A
Gamble's core claim is that early English cases reflect an established common-law *1970 rule barring domestic prosecution following a prosecution for the same act under a different sovereign's laws. But from the very dawn of the common law in medieval England until the adoption of the Fifth Amendment in 1791, there is not one reported decision barring a prosecution based on a prior trial under foreign law. We repeat: Gamble has not cited and we have not found a single pre-Fifth Amendment case in which a foreign acquittal or conviction barred a second trial in a British or American court. Given this void, Gamble faces a considerable challenge in convincing us that the Fifth Amendment was originally understood to establish such a bar.
Attempting to show that such a bar was available , Gamble points to five early English decisions for which we have case reports. We will examine these in some detail, but we note at the outset that they play only a secondary role for Gamble.
The foundation of his argument is a decision for which we have no case report: the prosecution in England in 1677 of a man named Hutchinson. (We have a report of a decision denying Hutchinson bail but no report of his trial.) As told by Gamble, Hutchinson, having been tried and acquitted in a foreign court for a murder committed abroad, was accused of the same homicide in an English tribunal, but the English court held that the foreign prosecution barred retrial.
Everything for Gamble stems from this one unreported decision. To the extent that the cases he cites provide any support for his argument-and for the most part, they do not-those cases purport to take their cue from the Hutchinson episode; the same is true of the treatises on which Gamble relies.
So what evidence do we have about what actually happened to Hutchinson? The most direct evidence is a report of his application for bail before the Court of King's Bench. The report spans all of one sentence:
"On Habeas Corpus it appeared the Defendant was committed to Newgate on suspicion of Murder in Portugal, which by Mr. Attorny being a Fact out of the Kings Dominions, is not triable by Commission, upon 35 H. 8. Cap. 2. §. I. N. 2. but by a Constable and Marshal, and the Court refused to Bail him, & c." Rex v. Hutchinson , 3 Keb. 785, 84 Eng. Rep. 1011 (1677).
From this report, all that we can tell about the court's thinking is that it found no convincing reason to grant bail, as was typical in murder cases.[3] The rest of the report concerns claims by an attorney. We are told that he contested the jurisdiction of the commission before which Hutchinson was to be tried, apparently a special commission that would have issued pursuant to a statute enacted under Henry VIII.[4] The commission lacked jurisdiction, the attorney seemed to suggest, because the crime had occurred in Portugal and thus "out of the Kings Dominions." The attorney claimed that jurisdiction lay instead with "a Constable and Marshal"-an apparent reference to the High Court of Chivalry, which dealt with treason and murder committed abroad.[5] But what, if *1971 anything, did the King's Bench make of the attorney's jurisdictional claims? And more to the point, what happened after bail was denied? The bail report does not say.
If Hutchinson did ultimately appear before the Court of Chivalry-and if that court accepted a plea of prior acquittal in Portugal-this would be paltry evidence of any common-law principle, which is what Gamble cites Hutchinson to establish. After all, the High Court of Chivalry was a civil-law court prohibited from proceeding under the common law (unlike every other English court of the time save Admiralty). 8 Ric. 2 ch. 5; see also Squibb 162; id., at xxv-xxvi ("The essential distinction between the Court of Chivalry and other courts is ... that it administers justice in relation to those military matters which are not governed by the common law"). Nor would it be any surprise that we have no report of the proceeding; in fact, "[t]here is no report of a case in which a judge of the Court [of Chivalry] has set out the reasons for his decision earlier than the [20th] century." Id ., at 162.
In the end, we have only two early accounts from judges of what finally became of Hutchinson, and both are indirect and shaky. First, they appear in the reports of cases decided in the Court of Chancery more than a half century after Hutchinson . Second, both judges cite only one source, and it is of lower authority than their own: namely, an account of Hutchinson given by an interested party (a defendant) in a previous, non -criminal case-an account on which the court in that case did not rely or even comment.[6] Insofar as our two judges seem to add their own details to the Hutchinson saga, we are not told where they obtained this information or whether it reflects mere guesses as to how gaps in the story should be filled in, decades after the fact. Finally, the two judges' accounts are not entirely consistent. Still, they are the only early judicial glosses on Hutchinson that we have, so we will work with them.
The more extensive account appears in the case of Gage v. Bulkeley , Ridg. T. H. 263, 27 Eng. Rep. 824 (Ch. 1744), and what the court said there-far from supporting Gamble's argument-cuts against it. Gage involved a bill in chancery for an account of money deposited with a banker in Paris. The defendants pleaded, as a bar to this lawsuit, "a sentence" "given upon" the same demand in a French court. Ibid . In addressing this plea, Lord Chancellor Hardwicke first determined that foreign judgments are not binding in an English court of law. Here his reasoning was very similar to that found in our dual-sovereignty decisions. Because each judgment rests on the authority of a particular sovereign, the Chancellor thought, it cannot bind foreign courts, which operate by the power of a different sovereign. Id. , at 263-264, 27 Eng. Rep., at 824.
Turning next to courts of equity, the Lord Chancellor saw no reason that the rule should be any different; there too, he thought, a foreign judgment is not binding. Id. , at 273, 27 Eng. Rep., at 827. But he did allow that in equity a foreign judgment *1972 could serve as "evidence, which may affect the right of [a plaintiff] when the cause comes to be heard." Ibid.
Elaborating on why foreign judgments did not bind English courts, whether of law or equity, the Lord Chancellor explained why Hutchinson was "no proof" to the contrary. In the Chancellor's telling, Hutchinson was not indicted by the Court of King's Bench, which could have tried a murder committed in England,[7] because that court had no jurisdiction over a homicide committed in Portugal. Gage , Ridge. T. H., at 271, 27 Eng. Rep., at 826-827. Instead, Hutchinson was (as the bail decision indicates) before that court on a writ of habeas corpus, and his case "was referred to the judges to know whether a commission should issue" under a statute similar to the one mentioned in the bail decision. Ibid., 27 Eng. Rep., at 827; see 33 Hen. 8 ch. 28 (1541-1542).[8] "And," he explained, "the judges very rightly and mercifully thought not, because he had undergone one trial already." Gage , Ridg. T. H., at 271-272, 27 Eng. Rep., at 827 (emphasis added). This suggests that Hutchinson was spared retrial as a matter of discretion ("merc[y]")-which must be true if the Chancellor was right that foreign judgments were not binding. Indeed, at least one modern scholar agrees (on other grounds as well) that the result in Hutchinson may have been based on "expediency rather than law." M. Friedland, Double Jeopardy 362-363 (1969).
In the end, then, Gage is doubly damaging to Gamble. First, it squarely rejects the proposition that a litigant in an English court-even a civil litigant in equity-had a right to the benefit of a foreign judgment, a right that the Fifth Amendment might have codified. And second, Gage undermines Gamble's chief historical example, Hutchinson , by giving a contrary reading of that case-and doing so, no less, in one of the only two judicial accounts of Hutchinson that we have from before the Fifth Amendment.
The other account appears in Burrows v. Jemino , 2 Str. 733, 93 Eng. Rep. 815 (K. B. 1726).[9] In Burrows , a party that was sued in England on a bill of exchange sought an injunction against this suit in the Court of Chancery, contending that the suit was barred by the judgment of a court in Italy. In explaining why he would grant the injunction, Lord Chancellor King cited Hutchinson , which he thought had involved an acquittal in Spanish court that was "allowed to be a good bar to any proceedings here." 2 Str. at 733, 93 Eng. Rep., at 815. This remark, showing that at least one English judge before the founding saw Hutchinson as Gamble does, provides a modicum of support for Gamble's argument. But that support softens just a few lines down in the report, where the Chancellor discusses the status of foreign *1973 judgments in courts of law in particular (as distinct from courts of equity like his own)-i .e ., the courts that actually applied the common-law rules later codified by the Fifth Amendment. Here the Chancellor explained that while he personally would have accepted an Italian judgment as barring any suit at law, "other Judges might be of a different opinion." Ibid. As a whole, then, the Chancellor's comments in Burrows can hardly be cited to prove that the common law had made up its mind on this matter; just the opposite.
Gamble's other cases have even less force. The "most instructive" case, he claims, see Brief for Petitioner 13, is the 1775 case of King v. Roche , 1 Leach 134,[10] 168 Eng. Rep. 169 (K.B.), but that is a curious choice since the Roche court does not so much as mention Hutchinson or even tacitly affirm its supposed holding. The defendant in Roche entered two pleas: prior acquittal abroad and not guilty of the charged crime. All that the Roche court held was that, as a procedural matter, it made no sense to charge the jury with both pleas at once, because a finding for Roche on the first (prior acquittal) would, if successful , bar consideration of the second (not guilty). Roche, 1 Leach, at 135, 168 Eng. Rep., at 169. But on our key question-whether a plea based on a foreign acquittal could be successful-the Roche court said absolutely nothing; it had no occasion to do so. Before the prosecution could reply to Roche's plea of prior acquittal, he withdrew it, opting for a full trial. The name Hutchinson does not appear even in the marginalia of the 1789 edition of Roche , which existed in 1791. See Captain Roche's Case , 1 Leach at 138-139.
Hutchinson is mentioned in connection with Roche only after the Fifth Amendment's ratification, and only in a compiler's annotation to the 1800 edition of the Roche case report. See 168 Eng. Rep., at 169, n. (a). That annotation in turn cites one case as support for its reading of Hutchinson : Beak v. Thyrwhit , 3 Mod. 194, 87 Eng. Rep. 124 (K. B. 1688). But Beak did not involve a foreign prosecution; indeed, it did not involve a prosecution at all. It was an admiralty case for trover and conversion of a ship, and-more to the point-Hutchinson is discussed only in the defendant's argument in that case, not the court's response. A report relaying the actual decision in Beak shows that the court ultimately said nothing about the defendant's Hutchinson argument one way or another. See Beake v. Tyrrell , 1 Show. K. B. 6, 89 Eng. Rep. 411 (1688).[11] This same defendant's argument was the only source of information about Hutchinson on which the Chancellors in Gage and Burrows explicitly relied, as we noted above. All later accounts of Hutchinson seem to stem from this one shallow root.
The last of Gamble's five pre-Fifth Amendment cases, Rex v. THOMAS , 1 Lev. 118, 83 Eng. Rep. 326 (K. B. 1664), did not even involve a foreign prosecution. The defendant was indicted for murder in England, and he pleaded a prior acquittal by a Welsh court. But Wales was then part of the "kingdom of England"; its laws were "the laws of England and no other." 1 Blackstone 94-95; see THOMAS , 1 Lev., at 118, 83 Eng. Rep., at 326-327. So the prior trial in THOMAS was not under another sovereign's laws, making it totally irrelevant for present purposes.
Summing up the import of the preratification cases on which Gamble's argument *1974 rests, we have the following: (1) not a single reported case in which a foreign acquittal or conviction barred a later prosecution for the same act in either Britain or America; (2) not a single reported decision in which a foreign judgment was held to be binding in a civil case in a court of law; (3) fragmentary and not entirely consistent evidence about a 17th-century case in which a defendant named Hutchinson, having been tried and acquitted for murder someplace in the Iberian Peninsula, is said to have been spared a second trial for this crime on some ground, perhaps out of "merc[y]," not as a matter of right; (4) two cases (one criminal, one in admiralty) in which a party invoked a prior foreign judgment, but the court did not endorse or rest anything on the party's reliance on that judgment; and (5) two Court of Chancery cases actually holding that foreign judgments were not (or not generally) treated as barring trial at common law. This is the flimsy foundation in case law for Gamble's argument that when the Fifth Amendment was ratified, it was well understood that a foreign criminal judgment would bar retrial for the same act.
Surveying the pre-Fifth Amendment cases in 1959, we concluded that their probative value was "dubious" due to "confused and inadequate reporting." Bartkus , 359 U.S. at 128, n. 9, 79 S.Ct. 676. Our assessment was accurate then, and the passing years have not made those early cases any clearer or more valuable.
B
Not to worry, Gamble responds: Whatever the English courts actually did prior to adoption of the Fifth Amendment, by that time the early English cases were widely thought to support his view. This is a curious argument indeed. It would have us hold that the Fifth Amendment codified a common-law right that existed in legend, not case law. In any event, the evidence that this right was thought to be settled is very thin.
Gamble's argument is based on treatises, but they are not nearly as helpful as he claims. Alone they do not come close to settling the historical question with enough force to meet Gamble's particular burden under stare decisis .
Gamble begins with Blackstone, but he reads volumes into a flyspeck. In the body of his Commentaries, all that Blackstone stated was that successive prosecutions could be barred by prior acquittals by "any court having competent jurisdiction of the offence." 4 Blackstone 335. This is simply a statement of the general double-jeopardy rule, without a word on separate sovereigns. So Gamble directs our attention to a footnote that appears after the phrase "any court having competent jurisdiction." The footnote refers to the report of Beak v. Thyrwhit , which, as noted, merely rehearses the argument of the defendant in that case, who in turn mentioned Hutchinson -but not in a criminal prosecution, much less one preceded by a foreign trial. This thread tying Blackstone to Hutchinson -a thread woven through footnotes and reports of reports but not a single statement by a court (or even by a party to an actual prosecution)-is tenuous evidence that Blackstone endorsed Gamble's reading of Hutchinson .
When Gamble's attorney was asked at argument which other treatises he found most likely to have informed those who ratified the Fifth Amendment, he offered four. See Tr. of Oral Arg. 30-31. But two of the four treatises did not exist when the Fifth Amendment was ratified. See 1 J. Chitty, Criminal Law 458 (1816); 1 T. Starkie, Criminal Pleading 300-301, n. h (1814). And a third discusses not a single case involving a prior prosecution under *1975 foreign law. See 2 W. Hawkins, Pleas of the Crown 372 (1739).
That leaves one treatise cited by Gamble that spoke to this issue before ratification, F. Buller, An Introduction to the Law Relative to Trials at Nisi Prius (5th ed. 1788). That treatise concerned the trial of civil cases, id ., at 2, and its discussion of prior judgments appeared under the heading "Of Evidence in general," id. , at 221. After considering the evidentiary value of such documents as acts of Parliament, deeds, and depositions, Buller addressed what we would later call issue preclusion. Lifting language from an earlier publication, H. Bathurst, The Theory of Evidence 39 (1761), Buller wrote that a final judgment was "conclusive Evidence" "against all the World" of the factual determinations underlying the judgment. Buller, Nisi Prius, at 245. And it is on this basis that Buller (again lifting from Bathurst) said that even someone acquitted of a crime in Spain "might," upon indictment in England, "plead the Acquittal in Spain in Bar." Ibid .
This endorsement of the preclusive effect of a foreign judgment in civil litigation (which even today is not uniformly accepted in this country[12] ) provides no direct support for Gamble since his prior judgment was one of conviction, not acquittal. (There is, after all, a major difference between the preclusive effect of a prior acquittal and that of a prior conviction: Only the first would make a subsequent prosecution pointless, by requiring later courts to assume a defendant's innocence from the start.) And in any case, the fleeting references in the Buller and Bathurst treatises are hardly sufficient to show that the Members of the First Congress and the state legislators who ratified the Fifth Amendment understood the Double Jeopardy Clause to bar a prosecution in this country after acquittal abroad for the same criminal conduct.
Gamble attempts to augment his support by citing treatises published after the Fifth Amendment was adopted.[13] And he notes that the Court in District of Columbia v. Heller , 554 U.S. 570, 605-610, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), took treatises of a similar vintage to shed light on the public understanding in 1791 of the right codified by the Second Amendment. But the Heller Court turned to these later treatises only after surveying what it regarded *1976 as a wealth of authority for its reading-including the text of the Second Amendment and state constitutions. The 19th-century treatises were treated as mere confirmation of what the Court thought had already been established. Here Gamble's evidence as to the understanding in 1791 of the double jeopardy right is not at all comparable.
C
When we turn from 19th-century treatises to 19th-century state cases, Gamble's argument appears no stronger. The last time we looked, we found these state cases to be "inconclusive." Bartkus , 359 U.S. at 131, 79 S.Ct. 676. They seemed to be evenly split and to "manifest conflict[s] in conscience" rather than confident conclusions about the common law. Ibid. Indeed, two of those cases manifested nothing more than a misreading of a then-recent decision of ours. Id. , at 130, 79 S.Ct. 676. We see things no differently today.
The distinction between believing successive prosecutions by separate sovereigns unjust and holding them unlawful appears right on the face of the first state case that Gamble discusses. In State v. Brown , 2 N. C. 100, 101 (1794), the court opined that it would be "against natural justice" for a man who stole a horse in the Ohio Territory to be punished for theft in North Carolina just for having brought the horse to that State. To avoid this result, the Brown court simply construed North Carolina's theft law not to reach the defendant's conduct. But it did so precisely because the defendant otherwise could face two prosecutions for the same act of theft-despite the common-law rule against double jeopardy for the same "offence"-since "the offence against the laws of this State, and the offence against the laws of [the Ohio Territory] are distinct; and satisfaction made for the offence committed against this State, is no satisfaction for the offence committed against the laws there." Ibid . Far from undermining the dual-sovereignty rule, Brown expressly affirms it, rejecting outright the idea that a judgment in one sovereign's court could "be pleadable in bar to an indictment" in another's. Ibid.
Other state courts were divided. Massachusetts and Michigan courts thought that at least some trials in either federal or state court could bar prosecution in the other, see Commonwealthv.Fuller , 49 Mass. 313, 318 (1844) ; Harlan v. People , 1 Doug. 207, 212 (Mich. 1843), but those antebellum cases are poor images of the founding-era common law, resting as they do on what we have explained, see Bartkus , 359 U.S. at 130, 79 S.Ct. 676, was a misreading of our then-recent decision in Houston v. Moore , 5 Wheat. 1, 5 L.Ed. 19 (1820), which we discuss below. A Vermont court did take the same view based on its own analysis of the question, State v. Randall , 2 Aik. 89, 100-101 (1827), but just a few years later a Virginia court declared the opposite, Hendrick v. Commonwealth , 32 Va. 707, 713 (1834) (punishment for forgery under both federal and Virginia law is not double punishment for the "same offence" since "the law of Virginia punishes the forgery, not because it is an offence against the U. States , but because it is an offence against this commonwealth"). And South Carolina-a perfect emblem of the time-produced cases cutting both ways. See State v. Antonio , 2 Tread. 776, 781 (1816) ; State v. Tutt , 2 Bail. 44, 47-48 (1831).
This is not the quantum of support for Gamble's claim about early American common law that might withstand his burden under stare decisis . And once we look beyond the Nation's earliest years, the body of state-court decisions appears even less helpful to Gamble's position. We aptly *1977 summarized those cases in Bartkus , 359 U.S. at 134-136, 79 S.Ct. 676, and need not add to that discussion here.[14]
D
Less useful still, for Gamble's purposes, are the two early Supreme Court cases on which he relies. In the first, a member of the Pennsylvania militia was tried by a state court-martial for the federal offense of deserting the militia. See Houston v. Moore , 5 Wheat. 1, 18 U.S. 1, 5 L.Ed. 19 (1820). The accused objected that the state court-martial lacked jurisdiction to try this federal offense. Since the offense could be tried in federal court, the defendant argued, allowing the state court-martial to try him for this crime could expose him to successive federal and state prosecutions for the same offense. Justice Washington answered that a ruling in either federal or state court would bar a second trial in the other. See id. , at 31. But as we later explained,
"that language by Mr. Justice Washington reflected his belief that the state statute imposed state sanctions for violation of a federal criminal law. As he viewed the matter, the two trials would not be of similar crimes arising out of the same conduct; they would be of the same crime. Mr. Justice Johnson agreed that if the state courts had become empowered to try the defendant for the federal offense, then such a state trial would bar a federal prosecution. Thus Houstonv.Moore can be cited only for the presence of a bar in a case in which the second trial is for a violation of the very statute whose violation by the same conduct has already been tried in the courts of another government empowered to try that question." Bartkus , 359 U.S. at 130, 79 S.Ct. 676 (citations omitted).
In other words, Justice Washington taught only that the law prohibits two sovereigns (in that case, Pennsylvania and the United States) from both trying an offense against one of them (the United States). That is consistent with our doctrine allowing successive prosecutions for offenses against separate sovereigns. In light of this reading of Houston , the case does not undercut our dual-sovereignty doctrine.
It may seem strange to think of state courts as prosecuting crimes against the United States, but that is just what state courts and commentators writing within a decade of Houston thought it involved. See, e.g. , Tutt , 2 Bail. at 47 ("In [ Houston ], the act punished by the law of the State, was certainly and exclusively an offence against the general Government ... [whereas h]ere, certainly there is an offence against the State, and a very different one from that committed against the *1978 United States" (emphasis added)); 1 J. Kent, Commentaries on American Law 373-374 (1826) ("[M]any ... acts of [C]ongress ... permit jurisdiction, over the offences therein described, to be exercised by state magistrates and courts," and what Houston bars are successive prosecutions for the same "crime against the United States"). Even the scholar Gamble cites for his cause finds Houston not "[o]n point" because it "was discussing the jurisdiction of the state court to try a crime against the nation and impose a fine payable to the latter government." Grant, Successive Prosecutions by State and Nation: Common Law and British Empire Comparisons, 4 UCLA L. Rev. 1, 7, and n. 27 (1956) (citing Warren, Federal Criminal Laws and the State Courts, 38 Harv. L. Rev. 545 (1925) ).
Perhaps feeling Houston wobble, Gamble says pre-emptively that if it is "inconclusive," Brief for Petitioner 26, other cases are clear. But the other federal case on which he leans is worse for his argument. In United States v. Furlong , 5 Wheat. 184, 197, 5 L.Ed. 64 (1820), we said that an acquittal of piracy in the court of any "civilized State" would bar prosecution in any other nation because piracy, as an "offence within the criminal jurisdiction of all nations," is "punished by all."[15] Ending his quotation from Furlong at this point, Gamble gives the impression that Furlong rejects any dual-sovereignty rule. But that impression is shattered by the next sentence: "Not so with the crime of murder." Ibid. As to that crime, the Furlong Court was "inclined to think that an acquittal" in the United States "would not have been a good plea in a Court of Great Britain." Ibid. (emphasis added). And that was precisely because murder is "punishable under the laws of each State" rather than falling under some "universal jurisdiction." Ibid. (emphasis added). When it came to crimes that were understood to offend against more than one sovereign, Furlong treated them as separate offenses-just as we have a dozen times since, and just as we do today.
Thus, of the two federal cases that Gamble cites against the dual-sovereignty rule, Houston squares with it and Furlong supports it. Together with the muddle in the early state cases, this undermines Gamble's claim that the early American bench and bar took the Fifth Amendment to proscribe successive prosecutions by different sovereigns. And without making a splash in the legal practice of the time, a few early treatises by themselves cannot unsettle almost two centuries of precedent.
IV
Besides appealing to the remote past, Gamble contends that recent changes-one doctrinal, one practical-blunt the force of stare decisis here. They do not.
A
If historical claims form the chorus of Gamble's argument, his refrain is "incorporation."
*1979 In Gamble's telling, the recognition of the Double Jeopardy Clause's incorporation against the States, see Benton v. Maryland , 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), washed away any theoretical foundation for the dual-sovereignty rule, see United States v. Gaudin , 515 U.S. 506, 521, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (abrogating precedent when "subsequent decisions of this Court" have "eroded" its foundations). But this incorporation-changes-everything argument trades on a false analogy.
The analogy Gamble draws is to the evolution of our doctrine on the Fourth Amendment right against unreasonable searches and seizures.[16] We have long enforced this right by barring courts from relying on evidence gathered in an illegal search. Thus, in Weeks v. United States , 232 U.S. 383, 391-393, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the Court held that federal prosecutors could not rely on the fruits of an unreasonable search undertaken by federal agents. But what if state or local police conducted a search that would have violated the Fourth Amendment if conducted by federal agents? Before incorporation, the state search would not have violated the Federal Constitution, so federal law would not have barred admission of the resulting evidence in a state prosecution. But by the very same token, under what was termed "the silver-platter doctrine," state authorities could hand such evidence over to federal prosecutors for use in a federal case. See id. , at 398, 34 S.Ct. 341.
Once the Fourth Amendment was held to apply to the States as well as the Federal Government, however, the silver-platter doctrine was scuttled. See Elkins v. United States , 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) ; Wolf v. Colorado , 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). Now the fruits of unreasonable state searches are inadmissible in federal and state courts alike.
Gamble contends that the incorporation of the Double Jeopardy Clause should likewise end the dual-sovereignty rule, but his analogy fails. The silver-platter doctrine was based on the fact that the state searches to which it applied did not at that time violate federal law. Once the Fourth Amendment was incorporated against the States, the status of those state searches changed. Now they did violate federal law, so the basis for the silver-platter doctrine was gone. See Elkins , 364 U.S. at 213, 80 S.Ct. 1437 ("The foundation upon which the admissibility of state-seized evidence in a federal trial originally rested-that unreasonable state searches did not violate the Federal Constitution-thus disappeared [with incorporation]").
By contrast, the premises of the dual-sovereignty doctrine have survived incorporation intact. Incorporation meant that the States were now required to abide by this Court's interpretation of the Double Jeopardy Clause. But that interpretation has long included the dual-sovereignty doctrine, and there is no logical reason why incorporation should change it. After all, the doctrine rests on the fact that only same-sovereign successive prosecutions are prosecutions for the "same offense," see Part II, supra -and that is just as true after incorporation as before.
B
If incorporation is the doctrinal shift that Gamble invokes to justify a departure from precedent, the practical change he cites is the proliferation of federal criminal law. Gamble says that the resulting overlap *1980 of federal and criminal codes heightens the risk of successive prosecutions under state and federal law for the same criminal conduct. Thus, Gamble contends, our precedent should yield to " 'far-reaching systemic and structural changes' " that make our "earlier error all the more egregious and harmful." South Dakotav.Wayfair, Inc. , 585 U.S. ----, ----, 138 S.Ct. 2080, 2097, 201 L.Ed.2d 403 (2018). But unlike Gamble's appeal to incorporation, this argument obviously assumes that the dual-sovereignty doctrine was legal error from the start. So the argument is only as strong as Gamble's argument about the original understanding of double jeopardy rights, an argument that we have found wanting.
Insofar as the expansion of the reach of federal criminal law has been questioned on constitutional rather than policy grounds, the argument has focused on whether Congress has overstepped its legislative powers under the Constitution. See, e.g. , Gonzales v. Raich , 545 U.S. 1, 57-74, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (THOMAS, J., dissenting). Eliminating the dual-sovereignty rule would do little to trim the reach of federal criminal law, and it would not even prevent many successive state and federal prosecutions for the same criminal conduct unless we also overruled the long-settled rule that an "offence" for double jeopardy purposes is defined by statutory elements, not by what might be described in a looser sense as a unit of criminal conduct. See Blockburger v. United States , 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Perhaps believing that two revolutionary assaults in the same case would be too much, Gamble has not asked us to overrule Blockburger along with the dual-sovereignty rule.
* * *
The judgment of the Court of Appeals for the Eleventh Circuit is affirmed.
It is so ordered.

In addressing that question, we follow the parties' lead and assume, without deciding, that the state and federal offenses at issue here satisfy the other criteria for being the "same offence" under our double jeopardy precedent. See Blockburger v. United States , 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

Gamble also cites founding-era uses of the word "offence" that are not tied to violations of a sovereign's laws, but the examples are not very telling. Some, for instance, play on the unremarkable fact that at the founding, "offence" could take on a different sense in nonlegal settings, much as "offense" does today. In this vein, Gamble cites a 19th-century dictionary defining "offense" broadly as "any transgression of law, divine or human; a crime; sin; act of wickedness or omission of duty." 2 N. Webster, An American Dictionary of the English Language (1828). But the question is what "offence" meant in legal contexts. See Moore v. Illinois , 14 How. 13, 19, 14 L.Ed. 306 (1852) ("An offence, in its legal signification , means the transgression of a law..." (emphasis added)).

See J. Beattie, Crime and the Courts in England: 1660-1800, pp. 281-282 (1986).

Although this Act reached conduct committed "out of the King Majesties Realme of Englande and other his Graces [Dominions]," Acte concerning the triall of Treasons 1543-1544, 35 Hen. 8 ch. 2 (1543-1544), it applied only to treasons and misprisions of treason-not to homicide, of which Hutchinson was accused.

See G. Squibb, The High Court of Chivalry 54, 147-148 (1959) (Squibb); 4 Blackstone 267.

See Gage v. Bulkeley , Ridg. T. H. 263, 271, 27 Eng. Rep. 824, 826-827 (Ch. 1744) (citing Beake v. Tyrrell , 1 Show. K. B. 6); Burrows v. Jemino , 2 Str. 733, 25 Eng. Rep. 235 (K. B. 1726) (same). As noted, the report cited by both judges-which also appears at 89 Eng. Rep. 411 (K. B. 1688)-mentions Hutchinson only in summarizing a defendant's argument. So does the only other source cited by either judge. See Gage , Ridg. T. H., at 271, 27 Eng. Rep., at 826-827 (citing Beak v. Thyrwhit , 3 Mod. 194, 87 Eng. Rep. 124 (K. B. 1688)). Below we discuss in detail the case that figures in these two reports. See infra , at 1973, and n. 11.

4 Blackstone 262.

This statute authorized commissioners to try certain defendants for acts of treason or murder committed "in whatsoever other Shire or place, within the King's dominions or without." But "[d]espite the words 'or without', contemporary opinion seems not to have regarded the extra-territorial operation of this Act as clear." Squibb 149. Indeed, the statute cited in the Hutchinson bail report, dated to just two years later, cited lingering "doubtes and questions" about whether English courts could try treason committed abroad (in the course of clarifying that treason and misprisions of treason abroad could indeed be tried in England). 35 Hen. 8 ch. 2, § I.

This case is also reported as Burrows v. Jemineau in Sel. Ca. t. 69, 25 Eng. Rep. 228 (Ch. 1726); as Burroughs v. Jamineau in Mos. 1, 25 Eng. Rep. 235; as Burrows v. Jemineau in 2 Eq. Ca. Abr. 476, 22 Eng. Rep. 405; and as Burrows v. Jemino in 2 Eq. Ca. Abr. 524, 22 Eng. Rep. 443.

This case is reported as Captain Roche's Case in 1 Leach 138 (1789 ed.) and in 2 Leach 125 (1792 ed.).

This decision is also reported as Beake v. Tirrell, Com. 120, 90 Eng. Rep. 379.

Compare Restatement (Fourth) of Foreign Relations Law of the United States § 481 (2018) (With a few specified exceptions, "a final, conclusive, and enforceable judgment of a court of a foreign state granting or denying recovery of a sum of money, or determining a legal controversy, is entitled to recognition by courts in the United States") and Restatement (Second) of Conflict of Laws § 98, Comment b . (1969) ("In most respects," judgments rendered in a foreign nation satisfying specified criteria "will be accorded the same degree of recognition to which sister State judgments are entitled"), with, e.g. , Derr v. Swarek , 766 F. 3d 430, 437 (CA5 2014) (recognition of foreign judgments is not required but is a matter of comity); Diorinou v. Mezitis , 237 F. 3d 133, 142-143 (CA2 2001) (same); id. , at 139-140 ("It is well-established that United States courts are not obliged to recognize judgments rendered by a foreign state, but may choose to give res judicata effect to foreign judgments on the basis of comity" (emphasis in original; internal quotation marks omitted)); MacArthur v. San Juan County , 497 F. 3d 1057, 1067 (CA10 2007) ("Comity is not an inexorable command ... and a request for recognition of a foreign judgment may be rebuffed on any number of grounds"); Guinness PLC v. Ward , 955 F. 2d 875, 883 (CA4 1992) ("The effect to be given foreign judgments has therefore historically been determined by more flexible principles of comity").

See, e .g ., F. Wharton, A Treatise on the Law of Homicide in the United States 283 (1855); F. Wharton, A Treatise on the Criminal Law of the United States 137 (1846); L. MacNally, The Rules of Evidence on Pleas of the Crown 428 (1802).

As we put it in Bartkus , 359 U.S. at 134-136, 79 S.Ct. 676 :
"Of the twenty-eight States which have considered the validity of successive state and federal prosecutions as against a challenge of violation of either a state constitutional double-jeopardy provision or a common-law evidentiary rule of autrefois acquit and autrefois convict , twenty-seven have refused to rule that the second prosecution was or would be barred. These States were not bound to follow this Court and its interpretation of the Fifth Amendment. The rules, constitutional, statutory, or common law which bound them, drew upon the same experience as did the Fifth Amendment, but were and are of separate and independent authority.
"Not all of the state cases manifest careful reasoning, for in some of them the language concerning double jeopardy is but offhand dictum. But in an array of state cases there may be found full consideration of the arguments supporting and denying a bar to a second prosecution. These courts interpreted their rules as not proscribing a second prosecution where the first was by a different government and for violation of a different statute." (Footnote omitted.)

Piracy was understood as a violation of the law of nations, which was seen as common to all. That is why any successive prosecution for piracy, being under the same law, would have been for the same offense. See United States v. Smith , 5 Wheat. 153, 163, 5 L.Ed. 57, n. a (1820) (quoting definitions of piracy by several ancient and more recent authorities). See also 4 Blackstone 71 ("[T]he crime of piracy , or robbery and depredation upon the high seas, is an offence against the universal law of society; a pirate being, according to Sir Edward Coke, hostis humani generis [enemies of mankind]. As therefore he has renounced all the benefits of society and government, and has reduced himself afresh to the savage state of nature, by declaring war against all mankind, all mankind must declare war against him: so that every community has a right, by the rule of self-defence, to inflict that punishment upon him, which every individual would in a state of nature have been otherwise entitled to do, for any invasion of his person or personal property" (footnote omitted)).

He draws a similar analogy to the Fifth Amendment right against self-incrimination, but our response to his Fourth Amendment analogy would answer that argument as well.