Deborah Lynn WALKER, et al. *v.* ARKANSAS DEPARTMENT OF HUMAN SERVICES, et al.; Don VENHAUS, et al. Intervenors

86-184                                    722 S.W.2d 558

Supreme Court of Arkansas
Opinion delivered January 20, 1987

*Griffin J. Stockley, Central Arkansas Legal Services*, for appellants.

*Stephen C. Sipes*, for appellees.

*Steve Clark*, Att'y Gen., by: *David S. Mitchell*, Asst. Att'y Gen., for intervenors.

*Youngdahl & Youngdahl, P.A.*, by: *Thomas H. McGowan* for amicus curiae, Arkansas Action for Foster Children.

*Paul R. Bosson*, for *amicus curiae*, Arkansas Juvenile

Judges Association.

JACK HOLT, JR., Chief Justice. The constitutionality of the Arkansas Juvenile Code's placement of jurisdiction of juvenile matters in county courts is challenged by this appeal. We hold that the exercise of exclusive jurisdiction over juveniles is not a permissible function of the county courts under the Arkansas Constitution.

The Arkansas Department of Human Services, appellee, filed a petition in the Pulaski County Juvenile Court to declare that Deborah Lynn Walker's two children were dependent-neglected as defined by Ark. Stat. Ann. § 45-403(4) (Repl. 1977). Walker filed a motion to dismiss, alleging that the county court's jurisdiction over juvenile matters was unconstitutional. The motion was denied and Walker's children were found to be dependent-neglected and were taken from her custody. The Pulaski County Circuit Court affirmed and Walker appealed the single issue of lack of jurisdiction, which we find in her favor.

The General Assembly by Act 215 of 1911, established a court, to be known as "Juvenile Court", and to be administered by the county judges of this state. The Act gave the county courts original jurisdiction over dependent, neglected and delinquent children.

The Arkansas juvenile courts continued to operate under Act 215 until the passage of the "Arkansas Juvenile Code" in 1975. Ark. Stat. Ann. §§ 45-401 to -454 (Repl. 1977 and Supp. 1985). Pertinent portions of the Code continue exclusive jurisdiction in the county courts. Section 45-405 provides:

Jurisdiction over juvenile matters under this Act is vested in the county courts of the several counties of this State. When exercising jurisdiction under this Act, the county court shall be known as the juvenile court of the county in which it is located. The court shall be presided over by the juvenile judge of such county and may be opened and adjourned from time to time as the juvenile judge may deem proper. Proceedings under this Act shall be conducted at the place designated by the County Judge. The Clerk of the County Court shall be clerk of the juvenile court, and any law enforcement officer, juvenile probation

officer or other person who is authorized by law to serve.
process issued from any of the courts of this State may
serve process issued from the juvenile court. [Acts 1975,
No. 451, § 5, p. 1179].

Section 45-406 states that "[t]he Juvenile Courts . . . shall
have original and exclusive jurisdiction in all cases of delin-
quency, juveniles in need of supervision and dependency-neglect
arising under this Act."

The purported constitutional basis for vesting the county
courts with exclusive jurisdiction over juveniles is found in Ark.
Const. art. 7, § 28, which provides:

> *The county courts shall have exclusive original
> jurisdiction in all matters relating to* county taxes, roads,
> bridges, ferries, paupers, bastardy, vagrants, the appren-
> ticeship of minors, the disbursement of money for county
> purposes, *and in every other case that may be necessary to*
> the internal improvement and *local concerns of the respec-*
> *tive counties.* The county court shall be held by one judge,
> except in cases otherwise herein provided (emphasis
> added).

Some 67 years ago this court examined this portion of our
constitution and, by a three-to-two vote, approved the vesting of
jurisdiction of juvenile matters in the county courts. *Ex Parte
King*, 141 Ark. 213, 217 S.W. 468 (1919). The majority found
authority for placing jurisdiction in the county courts in the "all-
embracing clause" of article 7, § 28 which provides for the county
court's exclusive original jurisdiction "in every other case that
may be necessary . . . to the local concerns of the respective
counties."

The *King* majority reasoned:

> In the minds of the framers of our Constitution, the
> subjects of "paupers, bastardy, vagrants and the appren-
> ticeship of minors" were considered matters of such local
> concern affecting the welfare of the immediate communi-
> ties or counties, respectively, where these classes of persons
> might be found, that it was deemed wise to vest in the
> county courts, as subordinate governmental agencies in
> control of the affairs of the county, the jurisdiction over

these subjects.

It occurs to a majority of us that governmental control over the subject-matter of infants, wards of the State, who are dependent, neglected and delinquent, as these terms are defined in the act under review, are in the same general class and are of the same character as the subjects above enumerated and were intended, in the general clause covering "every other case necessary to the local concerns of the respective counties," to come under the jurisdiction of the county courts vested by that clause.

If infants are dependent, neglected and in indigent circumstances, they are paupers; if they are born out of wedlock they are bastards; if they are idle and homeless they are vagrants; and if they have no trade or vocation they are subject to apprenticeship. If infants belong to some one or all of these classes, they come within the jurisdiction conferred upon the county courts by the above provision of the Constitution. If within any of these classes, the fact that they are infants should not render them any the less amenable to such jurisdiction.

The *King* opinion also held that the juvenile act of that day did not "create a court", which is prohibited by Ark. Const. art. 7, § 1. Instead, the court said, the legislature had only permissibly enlarged the subject matter jurisdiction of the county courts to embrace juvenile matters. We disagree.

Article 7, § 1 of our constitution specifically provides that the judicial power of our state shall be vested in one supreme court, circuit, county, and probate courts and in justices of the peace. Section one also grants general authority to the General Assembly to establish certain other courts such as municipal and chancery courts. Nowhere in the Constitution does it provide for the creation of a "juvenile court," nor does it permit the General Assembly to establish one. The authority to create a court lies solely in our constitution. The majority in *King* opined that the general assembly had merely placed jurisdiction over juveniles in the county court. The language of the act, however, was in terms of creation of a juvenile court. The majority's rationale is thus highly suspect.

Although we have alluded to *King* in several subsequent cases, our decisions do not show that its rationale has heretofore been challenged. *See e.g., Dyer* v. *Ross-Lawhon,* 288 Ark. 327, 704 S.W.2d 629 (1986); *Robins* v. *Arkansas Social Services,* 273 Ark. 241, 617 S.W.2d 857 (1981); *Lee* v. *Grubbs,* 269 Ark. 205, 599 S.W.2d 715 (1980); *Cude* v. *State,* 237 Ark. 927, 377 S.W.2d 816 (1964); and *Scott* v. *Brown,* 160 Ark. 489, 254 S.W. 1074 (1923). Obiter dictum in *Fortin* v. *Parrish & Reeves,* 258 Ark. 277, 524 S.W.2d 236 (1975), quoted the holding from *King* with approval. Nevertheless, we take this opportunity to closely reexamine the issue of juvenile court jurisdiction under our constitution. The only proper and permissible course for us to follow is simply to give effect to the plain language of the constitution. *City of Hot Springs* v. *Creviston,* 288 Ark. 286, 705 S.W.2d 415 (1986). In doing so, we declare that even if the rationale in the *King* decision had been correct when it was decided, and we have strong doubts, times have changed and it is clearly wrong in today's circumstances.

Two dissenting judges in *King* first expressed the view that juvenile matters are not encompassed by the term "local concerns." Chief Justice McCulloch stated:

The control of infants and any other class of dependent or helpless persons is not a matter of "local concern," within the meaning of that term as used in prescribing the jurisdiction of county courts. Such an application of it would convert it into a "general welfare clause," under which authority might be conferred on the county courts in all of the varied and intricate matters affecting society in the county — health, morals or prosperity or anything else. Such was not, in my judgment, the intention of the framers of the Constitution in the use of the term "local concern." I think it related solely to the antecedent term "internal improvement." Little Rock v. North Little Rock, 72 Ark. 195.

The construction of jails and the maintenance of prisoners incarcerated therein are matters of local concern within the exclusive jurisdiction of the county court, but the control over prisoners charged with crimes is not within such jurisdiction, for it belongs to those courts which

exercise criminal jurisdiction. Counties may, as matters of local concern, be authorized to build infirmaries for the care of insane persons and jurisdiction over it would be vested in the county court; but this would not carry with it jurisdiction over insane persons, which is, by the Constitution, vested in probate courts. So the counties could, by the Legislature, be authorized to build refuges for the care of dependent or incorrigible children, and that would constitute a matter of local concern, but it would not carry with it jurisdiction to determine when a child should be consigned to that refuge, . . .

Justice Frank Smith argued in his dissent that " 'local concern' must not be interpreted as meaning those things which the people of a particular community are locally concerned, for such a definition would include the suppression of crimes generally and many other matters over which no one would contend the county court had jurisdiction."

Justice Smith also refuted the majority's holding that the juvenile act did not create a court not sanctioned by the constitution. He stated:

I think it sufficiently appears from the analysis of the act under review contained in the majority opinion that a court, and not a mere administrative agency, has been created. It is so expressly stated in the act, and the jurisdiction of this court is defined and the practice and procedure therein are prescribed. It is true that certain functions of an administrative character are imposed on this court, but it remains a court notwithstanding that fact.

We agree with the reasoning of both of those dissenting opinions, particularly in light of the changes that have taken place since 1919. For *King* to vest the county court with exclusive jurisdiction over juveniles under a claim that they are "local concerns" of the county is erroneous. To the contrary, juvenile justice was and continues to be primarily a state concern. Juvenile matters today represent a major field of law with a statewide and nationwide social importance which preclude them from constituting an area of merely "local concern."

As pointed out in the dissent in *Kendall* v. *Henderson*,

238 Ark. 832, 384 S.W.2d 955 (1964), quoting *Cotham* v. *Coffman,* 111 Ark. 108, 163 S.W. 1183 (1914), "the purpose can not, in the sense of the Constitution, be both a State and county purpose. It must be one or the other." The same is true here. Jurisdiction over minors is a matter of state rather than local concern.

Walker presented extensive testimony to demonstrate the manner in which the role of the state and federal governments has long since surpassed the county's role in providing care for troubled and homeless juveniles. Gordon Page, an administrator for the Arkansas Department of Human Services, testified that the federal government contributed approximately 13 million dollars for the care of dependent-neglected children in 1986, and the state appropriated approximately 8 million dollars. He stated that local governments contributed only a "small portion of funds" to child welfare services. Scott Gordon, director of the state Division of Youth Services, testified that only about 5% of the budget for that agency's community-based programs for delinquent youth comes from county governments. The Division of Youth Services also carries out the federally funded Juvenile Justice Delinquency Prevention Act in Arkansas, the purpose of which is to "generally provide a comprehensive system of services designated to reduce and prevent delinquency."

Walker points to her case as an example of the comparative roles of local and state governments, in that the petition to have her children found dependent-neglected was brought by an employee of the state, following the state Department of Human Services' policy. Pursuant to state and federal laws, the juvenile court ordered extensive services to be provided by the Department of Human Services in attempting to reunite the family. In short, the county's involvement is minor compared to that of the state.

It is clear that juveniles, such as Walker's children, falling within the provisions of the Arkansas Juvenile Code present a wholly different concern than "paupers, bastardy, vagrants and the apprenticeship of minors." The purposes of the juvenile act involve the "care, custody and discipline of juveniles," rehabilitation of the juvenile's family in cases of dependency-neglect, placing dependent-neglected juveniles in "suitable homes," or, in

the case of "misguided" juveniles, giving "aid, encouragement, assistance and counseling," and failing that, placing the juvenile in a "suitable home, agency, institution, or other facility where he may be helped, educated, and equipped for useful citizenship." Ark. Stat. Ann. § 45-402 (Rep. 1977). The statewide and nationwide network of agencies and sources of funding necessary to carry out the far reaching and critical purposes of the act are obvious and have been in place for many years.

The judicial nature of determinations of delinquency and the resultant placement of juveniles in state institutions has also been more specifically defined since *King*. In *Application of Gault*, 387 U.S. 1 (1966), the Supreme Court held that juvenile court delinquency hearings must encompass the essentials of due process and fair treatment given to adults. The Arkansas Legislature has passed extensive enactments to attempt to ensure that the *Gault* requirements are met in juvenile courts. County courts do not, however, possess the same judicial safeguards as other state courts. By virtue of state and federal regulations and funding in this area, it is most obvious that the primary focus is with the state and not with the county. County courts, by their very nature, have been unable to ensure the proper disposition of juvenile delinquency cases. *Gault, supra.* For these reasons, jurisdiction over juveniles cannot under any circumstances be placed in the county court.

It would be desirable to make our ruling prospective to allow for a period of transition and the passage of legislation or the possible adoption of a constitutional amendment. However, we do not have the power to hold a constitutional mandate in abeyance. *City of Hot Springs* v. *Creviston*, 288 Ark. 293-A, 713 S.W.2d 230 (1986), supplemental opinion issued on denial of rehearing. We leave the matter of achieving a constitutional system to the legislature, the body equipped and designed to perform that function. *Dupree* v. *Alma School Dist.*, 279 Ark. 340, 651 S.W.2d 90 (1983).

In divesting the county court of its jurisdiction over juveniles, we note its de facto existence. *See Tumbs* v. *State*, 290 Ark. 214, 717 S.W.2d 492 (1986). We held in *Tumbs*, quoting *Landthrip* v. *City of Beebe*, 268 Ark. 45, 593 S.W.2d 458 (1980), that "[w]hen a court is organized under color of law, e.g., when its

creation is authorized by law, but the proceedings creating it are irregular or defective, it is a de facto court and its judgments and proceedings are not open to collateral attack."

■ This doctrine of validating acts of a de facto court is based on the sound principle of protecting the public and third parties. Accordingly, county courts have exercised jurisdiction over juveniles in the past under color of law and their proceedings and judgments may not be collaterally attacked.

The decision of the trial court is reversed.

DUDLEY, J., not participating.

HICKMAN and PURTLE, JJ., concur.

DARRELL HICKMAN, Justice, concurring. When the smoke settles from our decision, two things will become obvious. Our legal decision is right, and it will not, or should not, disrupt the legal process in Arkansas. It will only strengthen it.

The General Assembly created a separate court in 1911, calling it the juvenile court. At that time the county judge had several judicial duties, including probate matters. Even so, the county court has always been a court of limited jurisdiction, not general jurisdiction, as are the circuit and chancery courts. There is no mention of juveniles or matters relating to juveniles in the constitutional article creating the county court. A bare majority of this court in 1919 found that the language of the constitutional provision creating the county courts could be stretched to include juvenile matters. The most obvious place, then and now, for such jurisdiction is with a trial court. We do not know why the General Assembly made the decision it did, nor why juvenile matters have been neglected so long by our legal system. More than likely it has simply been a case of inertia.

Once accomplished, it became easy to drift along with no one questioning the original wisdom of a decision. The circuit judges and chancellors have never expressed a desire for such jurisdiction and an establishment of sorts, the juvenile justice system, has grown up with a built-in interest to perpetuate a system long past due for correction.

In 1975 the General Assembly adopted a new juvenile code authorizing a system of juvenile referees to act for the county

judge as juvenile judges. The referees have to be lawyers. The most noticeable example of the legislature's intention to create a new court is found in a provision of the new code which reads:

> The decisions of the juvenile referee shall be binding upon the county judge, who shall sign any order or judgment delivered by the juvenile referee and such order or judgment shall be a decision of the county judge.

Ark. Stat. Ann. § 45-440 (Repl. 1977).

In other words, the county judge is not the judge — the juvenile referee is the judge and the court. At the present time there are 61 lawyers serving as juvenile referees in Arkansas. Only 15 county judges still serve as the judge in such matters. So we have in place a new court system created in violation of the Arkansas Constitution.

Can legislation be passed to keep juvenile matters in the county courts? The answer is no. It is too late. As the majority opinion says, even if such a subject matter might have been proper in 1911, it is no longer even thinkable.

Fixing it may seem hard at first blush; but it will not be. All the legislature has to do is decide where to place jurisdiction for juvenile matters. The choices are either the circuit court or the chancery court, or both. At the present time the circuit court reviews all decisions made by the juvenile "court" and is familiar with the law and procedure. It would not be a bad decision to pronounce circuit courts would have jurisdiction in all juvenile matters. It might, however, add considerably to the case load of some of those courts. The legislature may consider simply transferring jurisdiction to the chancery courts. This might not be a bad decision. But juvenile delinquency laws are essentially penal in nature and traditionally reserved for law courts. It might not be constitutional in this regard.

The best answer would be to divide jurisdiction between circuit and chancery courts — juvenile delinquency questions to the circuit court, neglected and dependent children questions to chancery court.

At one time juvenile delinquents were considered criminals. While that view has softened, that part of the juvenile procedure

directed to juvenile delinquents could rightly be considered a matter properly belonging in circuit court. Matters concerning dependent and neglected children obviously should be in chancery court where that judge already has jurisdiction over guardianship as probate judge and custody of children as chancellor. At last, one judge would have in his control all matters relating to custody, guardianship, or the care of neglected and dependent children. This solution would also spread out the additional work load caused by the added jurisdiction.

The least desirable answer, in my opinion, would be to simply pick up the existing juvenile referee system and transfer it *in toto* to chancery or circuit court. That will no doubt be the first solution considered. The legislature will have to consider practical as well as theoretical problems, such as what to do with the juvenile referees and what to do about the extra case load. The legislature ought to resist the temptation to continue using referees or the permanent referee system. Referees and masters are simply substitutes for the judge, and there is no place in our judicial system for permanent substitutes for judges. Such referees mean only one thing to the people that have to appear before them: their problem does not deserve the attention of a real judge. While no reflection is or should be cast on those who have served as referees, it would be a disservice to the people to continue to treat juvenile matters as a second-rate legal problem and continue a system that does just that. This matter deserves the full respect of our judicial system.

Juveniles in trouble are one of the most serious concerns for our society, our government, and our judicial system. There are rarely quick, easy, clear answers in juvenile matters. Such cases involve children out-of-control; children mentally, physically and sexually abused; children abandoned or neglected. These cases tax society and the legal system. But can there be more important questions which deserve the full attention of our judicial system? How many permanent wards of the state, who end up on welfare, in the penitentiary or in our mental institutions, surface first in juvenile courts? The problem demands the best attention we can give it and the best talent we have — that means a full-fledged judge, mature, experienced and directly accountable to the people.

Our constitutional scheme does not contemplate a court system of permanent referees who are not directly accountable to the people. The chancellors or circuit court judges, or both, will probably not welcome the work, and the juvenile referees may resist giving up their roles. But this is one instance where personal and selfish concerns must be set aside. Our judicial system can be set right, and it ought to be done as quickly and efficiently as possible. The benefits to the people, the law, and our judicial system will be immeasurable if it is done right. If not, the problem will languish until a later time when it has to be addressed again.

A good many trial judges can absorb the work load without inconvenience. Some may be pressed. A few might be overworked to the point that cases stack up. Some counties may require an extra judge to handle the case load. The figures are available showing the work load of the trial courts in each circuit, and they will readily tell where any extra judges are needed. Arkansas has been adding an average of one trial judge every year for the last ten years. More will be added this year. Almost certainly, our present system can absorb this extra work without serious disruptions. The cost for the transition should not be great. In fact the cost to the state and counties should be less than the present cost of the system. Once the smoke clears, I feel the legislature's decision will not be all that difficult. If later adjustments are needed to correct an overload of a circuit, it can be done.

JOHN I. PURTLE, Justice, concurring. I believe *Ex Parte King*, 141 Ark. 213, 217 S.W. 468 (1919) has been misunderstood over the years. I agree with that part of the *King* opinion which held that Act 215 of 1911 permissibly enlarged the jurisdiction of the county courts. The *King* opinion stated as follows:

> "[I]t was not the intention of the Legislature to create a separate and independent tribunal and vest it with certain functions and powers, but rather to place within the jurisdiction and power of the county court, in the manner provided in the act, the subject-matter of the disposition of minors, who, for purposes of the act, are considered wards of the state."

Although the *King* decision went on to state that the Arkansas Constitution vested jurisdiction of the subject matter in

the county courts, it did not hold that such jurisdiction was exclusive. The specific question addressed in *King* was: "Was it within the power of the Legislature to confer upon the county court jurisdiction of the subject-matter contained in this act?" *King* at 219. Therefore, I think the opinion has been misread by those who have relied upon it over the last 60 years.

Regardless of whether *King* is overruled, I would hold that the General Assembly has the authority to assign the subject of dependent-neglected juveniles to any existing court, including the county court. By this opinion I do not mean to suggest that the matter should not be addressed by the legislature or that the decision as to the tribunal best suited to exercise jurisdiction of this kind should not be given careful consideration.