Cite as 2025 Ark. 180

# SUPREME COURT OF ARKANSAS

No. CV–24–710

| | |
|---|---|
| DAVID SCOTT TAYLOR<br><br>APPELLANT<br><br>V.<br><br>RICK FERGUSON; PARADISE VALLEY, LLC; WATERVIEW MEADOWS, LLC; WATERVIEW ESTATES, LLC; WATERVIEW ESTATES PHASE III, LLC; AFF HOLDINGS, LLC; AND WATERVIEW ESTATES PHASE VI & VII, LLC<br><br>APPELLEES | Opinion Delivered: November 13, 2025<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-22-3911]<br><br>HON. LATONYA HONORABLE, JUDGE<br><br><u>REVERSED AND REMANDED</u>. |

**NICHOLAS J. BRONNI, Associate Justice**

Does a dispute over flooding allegedly caused by a private residential development have to be brought initially in county court? Plaintiff David Scott Taylor owns property near Pinnacle Mountain. He claims that Defendant Rick Ferguson's neighboring property development causes his property to flood, and he sued Ferguson in circuit court. Ferguson moved to dismiss Taylor's complaint for lack of subject-matter jurisdiction. The circuit court agreed and dismissed Taylor's complaint on the grounds that it involved matters that article 7, section 28 of the Arkansas Constitution assigns to the county court. Taylor appeals, arguing that provision does not apply here. Moreover, he argues that, even if it did, the county court—essentially, the county executive, headed by a county judge, rather than a judicial entity—otherwise lacks jurisdiction to hear common-law claims. We agree with

Taylor's first argument; decline to reach his second; and reverse and remand this matter for proceedings consistent with this opinion.

Facts and Procedural Background

The dispute between Taylor and Ferguson arises from their neighboring properties in an unincorporated portion of Pulaski County near Pinnacle Mountain. Their properties are separated by Roland Cutoff Road, a county road. Ferguson and various entities that he controls own about 70 percent of a 356-acre tract on the south side of Roland Cutoff Road, and Taylor owns approximately twenty acres on the road's north side. Since 2021, Ferguson's land has been under development as the Paradise Valley subdivision. Pulaski County approved that development, and when completed, it is expected to contain 400 homes.

Taylor claims that development causes his property to flood and that the problem is only going to get worse. Currently, when it rains on Ferguson's property, the rainfall drains north, passes through culverts underneath Roland Cutoff Road, and empties into a tributary of Mill Bayou that passes through Taylor's property. The tributary, Taylor claims, already overflows its banks and floods his property, and he alleges that the clearing of vegetation, additional paving, and Ferguson's planned drainage ditch—which would channel even more runoff north across the road—will increase flooding by as much as 400 percent.

Seeking to mitigate that alleged flooding, Taylor sued Ferguson. His original complaint in the Pulaski County Circuit Court asserted negligence, trespass, private nuisance, and public nuisance. The public-nuisance claim rested on the argument that Ferguson's development would increase flooding on Roland Cutoff Road and make that

2

road impassable. Ferguson moved to dismiss that complaint for lack of jurisdiction. He argued that Taylor's claims concerned both county roads and "internal improvement and local concerns." As such, he argued, article 7, section 28 of the Arkansas Constitution required Taylor to pursue them in county court. *See* Ark. Const. art. 7, § 28 (vesting the county court with "exclusive original jurisdiction" over such matters). Ferguson also counterclaimed against Taylor.

Taylor responded by amending his original complaint to drop the public-nuisance claim and all references to Roland Cutoff Road. His current complaint does not challenge the county's approval of the Paradise Valley subdivision or seek alterations to any county roads. It seeks damages and equitable relief requiring Ferguson to take "reasonable steps to avoid substantial harm to [Taylor] caused by the increased runoff . . . during storm events." In particular, Taylor seeks to compel Ferguson to construct a larger storm-water detention pond than is currently planned to mitigate flooding.

After Taylor amended his complaint, Ferguson renewed his motion to dismiss. He argued that despite Taylor's amendments, his complaint still sought to litigate issues that article 7, section 28 assigns to county courts. For instance, he argued that Taylor's requested mitigation might require modifying existing roads and effectively challenged a development that the county had previously approved.

The circuit court initially denied Ferguson's renewed motion to dismiss. But when Ferguson asked the court to reconsider, it reversed course, concluding that article 7, section 28 of the Arkansas Constitution vests the county court with exclusive original jurisdiction

3

to decide Taylor's claims. It dismissed Taylor's case for lack of subject-matter jurisdiction, and Ferguson then nonsuited his counterclaim. This appeal followed.

Discussion

We review a circuit court's decision dismissing a complaint for lack of subject-matter jurisdiction de novo. *Osage Creek Cultivation, LLC v. Ark. Dep't of Fin. & Admin.*, 2023 Ark. 47, at 5, 660 S.W.3d 843, 846. Conducting that review, we hold that the circuit erred in dismissing Taylor's complaint. This case does not involve county roads, internal improvement, or local concerns as those terms are used in article 7, section 28. Instead, it is a private residential dispute over flooding, and our constitution assigns such disputes to circuit court. We therefore reverse and remand for further proceedings in circuit court.

A. We begin with first principles. Under our constitution, the county court is not—as its name might suggest—a judicial body; it is the county executive, headed by a county judge. *See* Ark. Const. art. 7, § 28; ("The County Court shall be held by one judge, except in cases otherwise herein provided."); Ark. Code Ann. § 14-14-1105 (Repl. 2013) (describing "the county judge as the chief executive of the county" and listing county judge's power to decide certain matters, including those listed in article 7, section 28). And article 7, section 28 of our constitution vests that entity with "exclusive original jurisdiction in all matters relating to county taxes, roads, bridges, ferries, paupers, bastardy, vagrants, the apprenticeship of minors," county spending, and "every other case that may be necessary to the internal improvement and local concerns of the respective county." Thus, as relevant here, our constitution grants the county's chief executive the power to make certain

4

executive decisions and says that disputes over such decisions—like where to put a bridge or a road—should be resolved in the first instance by the county executive.

By contrast, our constitution vests "[t]he judicial power . . . in the Judicial Department of state government" and assigns to circuit courts "original jurisdiction" over "all justiciable matters not otherwise assigned pursuant to this Constitution." Ark Const. amend. 80, §§ 1, 6. It also empowers circuit courts to hear "[a]ppeals from all judgments of County Courts . . . under such restrictions and regulations as may be prescribed by law." Ark. Const. art. 7, § 33. So, as pertinent here, while most matters can be brought directly in circuit court, certain matters listed in article 7, section 28 must be brought initially—as the phrase "exclusive *original* jurisdiction" indicates—in the county court with an appeal to the circuit court. *See* Ark. Dist. Ct. R. 2 (all appeals from county court judgments "shall be de novo to circuit court").

B. This case is about the interaction between those provisions and requires us to decide whether Taylor had to pursue his claims in county court before going to circuit court. Taylor argues that article 7, section 28 does not require him to start in county court. Indeed, he argues the county court, as a non-judicial entity, lacks the authority to even hear common-law claims. Ferguson, on the other hand, argues that Taylor's complaint involves matters relating to county roads, internal improvement, and local concerns, and that, as a result, Taylor must go to the county court first. We conclude that Taylor was not required to file his complaint in county court because this case does not involve any of the matters that article 7, section 28 assigns to the exclusive original jurisdiction of the county court.

5

We need not—and do not—reach Taylor's broader argument about the county court's ability to resolve any common-law claim.

1. Starting with the county roads argument, Ferguson argues that Taylor must bring his claims in county court for two reasons. First, he argues that Taylor's claims necessarily involve county roads because they concern the Paradise Valley subdivision and that subdivision "involves the creation of county roads." Second, he argues that because "Taylor's property is on the north side of Roland Cut-Off Road (a county road) and [Paradise Valley] . . . is on the opposite side" and water flows under and across that road, this case necessarily involves county roads. But our constitution's language does not sweep nearly so far, sending every claim that tangentially involves street paving or properties separated by a road to county court.

Far from it, article 7, section 28's language only requires "matters relating to" county roads be brought first in county court, and the phrase "relating to" requires more than the mere presence of streets. *See Cnty. Bd. of Election Comm'rs v. Waggoner*, 190 Ark. 341, 346, 78 S.W.2d 821, 823 (1935) ("Many cases may arise and many have arisen where suits had to be brought with reference to roads, taxes, bridges, etc., and it has never been contended that the county court had jurisdiction to try such cases."). Rather, it requires a "logical or causal connection between" the controversy and a county road. *Relate, The Merriam-Webster Dictionary* (New ed., 2016); *accord Relate, American Dictionary of the English Language* (1828 ed.), https://webstersdictionary1828.com/Dictionary/relate (archived at https://perma.cc/7GRV-ZM58) ("to regard" or "respect"); *Relate, Webster's Dictionary* (1913 ed.), https://www.websters1913.com/words/Relate (archived at

https://perma.cc/8NTA-9SN7) ("To stand in some relation; to have bearing or concern; to pertain; to refer; with *to*"); *Relate, Oxford English Dictionary* https://www.oed.com/dictionary/relate_v?tab=meaning_and_use#25955291, (archived at https://perma.cc/P75E-WM4K) (suggesting the term has meant "to have some connection with; to stand in relation to" since 1646). Our previous cases reflect that understanding, only finding exclusive original jurisdiction in county courts where a county road is itself central to the dispute. *See Chestnut v. Norwood*, 292 Ark. 498, 500, 731 S.W.2d 200, 202 (1987) (holding that a plaintiff's claim that a county road's culverts caused erosion had to be brought in county court because the culverts were alleged to be the source of the plaintiff's injury); *Chamberlain v. Newton Cnty.*, 266 Ark. 516, 521, 587 S.W.2d 4, 7 (1979) (alleging the county built a road across private land without consent).

This case does not meet that standard. Taylor's current complaint "doesn't allege any harm caused by or to Roland Cutoff Road" or seek any changes to that road. At most, it alleges that stormwater runoff flows through the culverts underneath that road before it enters the tributary that runs through and floods his property. But critically, Taylor does not argue that Roland Cutoff Road or the culverts underneath that road cause his injuries. Instead, he argues that development on Ferguson's side of the road and Ferguson's failure to construct adequate storm-water detention ponds causes them. In other words, unlike in *Chestnut v. Norwood*, where the plaintiff alleged the culverts caused the plaintiff's injury, Taylor claims he is injured by what happens *before* the water ever reaches the culverts. That means neither Roland Cutoff Road nor the culverts underneath are central to this dispute.

7

Nor does Taylor's reference to paving—including future potential street paving—in Paradise Valley change the analysis. While Taylor has suggested that additional paving, along with clearcutting, increases runoff and flooding, he does not claim that any county roads cause those problems or seek any street changes. Taylor focuses instead on what he alleges is Ferguson's failure to construct adequate storm-water detention ponds, and he seeks to compel the construction of larger ponds. Consequently, as above, the streets in Paradise Valley are not central to this dispute, and we hold that this private dispute about whether Ferguson took adequate steps to control rainwater runoff before it reaches Taylor's property is not a matter "relating to county . . . roads."

2. Ferguson also argues that this is a "case that may be necessary to the internal improvement and local concerns." Our prior cases have treated "internal improvement" and "local concerns" separately, and following that approach here, we conclude that this case involves neither.[1]

a. Begin with "internal improvement." That phrase is not self-defining and lacks an obvious definition. Yet the circuit court treated it that way, using its contemporary conception of internal improvement to simply declare that any development approved by the county constitutes an internal improvement. That is not how we read constitutional provisions.

---

[1]This court has not addressed what effect the word "and" has on the operation of this provision. The text would seem to suggest, contrary to our cases, that a case must be necessary to both internal improvement and local concerns for it to fall within county courts' jurisdiction. *See Pierce v. State*, 362 Ark. 491, 504, 209 S.W.3d 364, 371 (2005). But as Ferguson loses under our existing cases, we need not revisit that issue here.

Instead, "[w]hen interpreting a constitutional provision, we must look to the natural meaning of the text as it would have been understood at the time of [its adoption]." *Noel Canning v. N.L.R.B.*, 705 F.3d 490, 500 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014); *accord District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008) ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."); *Rhode Island v. Massachusetts*, 37 U.S. 657, 721 (1838) (the federal Constitution's meaning "must necessarily depend on the words of the constitution; the meaning and intention of the convention which framed and proposed it for adoption and ratification"); *McNabb v. Harrison*, 710 S.W.3d 653, 658 (Tenn. 2025) ("[I]n construing constitutional provisions, this Court seeks to determine the original public meaning."); *Johnson v. Wright*, 2022 Ark. 57, at 13, 640 S.W.3d 401, 408 (Wood, J., concurring) ("[W]e must apply the original meaning the drafters gave us."); *Thurston v. League of Women Voters of Ark.*, 2022 Ark. 32, at 20, 639 S.W.3d 319, 329 (Womack, J., dissenting) ("[W]e must focus on the original public meaning: what did those who ratified the constitution understand article 5, section 20 to mean?").

We do so because language changes over time, and applying contemporary meanings to older texts, can "mislead" the reader and lead to "misunderstand[ings]" that change a provision's "meaning entirely." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 78 (2012) (citing example of Queen Anne's description of Christopher Wren's redesign of St. Paul's Cathedral as "awful, artificial, and amusing" and explaining that—while those words might mean something very different today—at the time, Queen Anne's words would have been understood to mean "awe-inspiring, highly

9

artistic, and thought-provoking"); *see also* Lawrence B. Solum, *District of Columbia v. Heller and Originalism*, 103 Nw. U. L. Rev. 923, 945 (2009) (explaining that using the contemporary definition of "deer" to interpret that term's meaning in a twelfth century letter would be misleading because in Middle English that term did not refer to the specific animal we think of today but virtually any animal). That matters because "[w]hen government-adopted texts," like constitutions, "are given new meaning, the law is changed; and changing written law" is "[in]compatible with democracy" and the judicial role. Scalia & Garner, *supra* at 82; *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 384 n.5 (2021) (Gorsuch, J., concurring) ("Seeking to understand the Constitution's original meaning is part of our job.").

Recognizing that our constitution, like its federal counterpart, "is a written instrument" and "[as] such its meaning does not alter" over time, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 359 (1995) (Thomas, J., concurring in judgment) (quoting *South Carolina v. United States*, 199 U.S. 437, 448 (1905)), we consider how the phrase "internal improvement" would have been understood at the time of our constitution's adoption. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 35–37 (2022) (looking to how the language of the Second Amendment would have been understood at the time of its adoption to determine its scope); *Alden v. Maine*, 527 U.S. 706, 741 (1999) ("We look first to evidence of the original understanding of the Constitution."); *Wisconsin Just. Initiative, Inc. v. Wisconsin Elections Comm'n*, 990 N.W.2d 122, 130 (Wis. 2023) ("Our constitutions—state and federal—are written documents. They are law and should be read as such.").

Doing that, we conclude that when our constitution was adopted in 1874, the phrase internal improvement meant infrastructure projects "designed and intended for the benefit of the public." *In re Internal Improvements*, 32 P. 611, 612 (Colo. 1893); *see also United States v. Cnty. Comm'rs of Dodge Cnty.*, 110 U.S. 156, 162 (1884) ("a bridge across the Platte River is a work of internal improvement, for the benefit of the public"). And our earlier cases reflect that understanding. *See, e.g.*, *Curry v. Dawson*, 238 Ark. 310, 313, 379 S.W.2d 287, 289 (1964) (construction of a county hospital "is a matter of internal improvement and local concern").

That reading, moreover, is supported by the long and storied history of the phrase internal improvement—albeit in the plural rather than the singular form. After all, "the most sustained and significant constitutional" debates of the early American republic concerned the federal government's power to construct "internal improvements," that is, public infrastructure projects, like "roads, canals, harbors, lighthouses, and, later, railroads." David S. Schwartz, *Misreading McCulloch v. Maryland*, 18 U. Pa. J. Const. L. 1, 47 (2015); *see also* James Madison, *Veto Message to Congress, March 3, 1817, reprinted in* James Madison Writings 718–720 (Jack N. Rakove ed., 1999) (vetoing "internal improvements" bill on the grounds that Congress lacked the authority "to construct roads and canals, and to improve the navigation of water courses in order to facilitate, promote, and secure such a commerce"). That was the ordinary public meaning of that phrase when our first constitution used it in 1836 to describe county court jurisdiction. *See* Ark. Const. of 1836, art. 6, § 9 ("[T]he county court . . . shall have jurisdiction . . . in every other case that may be necessary to the internal improvements and local concerns of the respective counties.").

Indeed, another provision in our original constitution—like nearly every other state constitution adopted around the same time—underscores that reading, when it says that "[i]nternal improvements shall be encouraged by the government of this state" and that the General Assembly should make provisions for the "proper objects of improvement in relation to roads, canals and navigable waters." Ark. Const. of 1836, art. 7, § 7; *see Att'y Gen. v. Pingree*, 79 N.W. 814, 816 (Mich. 1899) ("[n]early all the state constitutions adopted between 1830 and 1850 either gave the legislature permission, or made it mandatory, to 'encourage internal improvements within the state'"); *Rippe v. Becker*, 57 N.W. 331, 335 (Minn. 1894) (similar).

There is also no reason to believe that phrase's meaning changed when it was included in subsequent versions of our constitution, right up to the present. *See* Ark. Const. of 1861, art. 6, § 11 (using "internal improvement" language in virtually identical county court jurisdictional provision); Ark. Const. of 1864, art. 7, § 11 (same); *cf.* Ark. Const. of 1868, art. 7, § 5 (providing that "[t]he inferior courts of the State as now constituted, except as herein provided, shall remain with the same jurisdiction as they now possess" and not suggesting any changes that would have transferred jurisdiction over internal improvement from the county courts). On the contrary, the use of the same language strongly suggests that, despite other profound changes, our present constitution's drafters intended to retain the original meaning of internal improvement. *See Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it

12

was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."); Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947) ("[I]f a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."). Thus, employing that phrase's original public meaning, we hold that "internal improvement" means public infrastructure projects—not private developments, even if they happen to be approved by the county or otherwise benefit the county.

By that measure, this is an easy case. Paradise Valley is not an "internal improvement." In a literal, modern sense, as the circuit court held, the development may internally improve the county, and it may benefit the county and county residents. Yet it is not—as article 7, section 28 requires for exclusive original jurisdiction—a government-funded infrastructure project. The circuit court erred in holding otherwise.

b. Nor is this case "necessary to" the "local concerns" of Pulaski County. We have previously explained that the phrase "local concerns" does not simply refer to "things which the people of a particular community are locally concerned." *Walker v. Ark. Dep't of Hum. Servs.*, 291 Ark. 43, 48, 722 S.W.2d 558, 561 (1987). Rather, consistent with the remainder of article 7, section 28, the phrase simply refers to things within the county's control. *See City of Little Rock v. Town of N. Little Rock*, 72 Ark. 195, 204, 79 S.W. 785, 788 (1904) (holding "the local concerns over which the county court is given exclusive jurisdiction are those which relate specially to county affairs" and that does not include things, like municipal boundaries or city streets); *see also Freeman v. Lazarus*, 61 Ark. 247, 252, 32 S.W. 680, 682 (1895) (location of county seat and issuance of liquor licenses); *Willeford v. State*,

13

43 Ark. 62 (1884) (county seat). And conversely, we have held that a matter is not one of local concern if the county lacks authority over it. *Reeves v. Been*, 217 Ark. 67, 73, 228 S.W.2d 609, 612 (1950) (education spending not a local concern because the constitution commits education to the legislature); *Walker*, 291 Ark. 43, 722 S.W.2d 558 (juveniles not within county court jurisdiction because that authority lies in other courts exercising criminal jurisdiction).

This private dispute over flooding and whether Ferguson has taken adequate steps to address flooding onto his neighbor's property does not meet that standard. Ferguson argues that because the county regulates environmental protection, floodplain development, and drainage improvements, Paradise Valley's development is necessarily of local concern. *See* Ark. Code Ann. § 14–17–206 (Repl. 2013) (requiring the county to adopt a plan that reflects the county's "development policies" over those matters); Ark. Code Ann. § 14–17–208 (Supp. 2025) (requiring the county planning board and quorum court "to administer the ordinance controlling the development" of subdivisions). In fact, he stresses the county's decision to approve Paradise Valley's development and argues that, as such, Taylor's lawsuit necessarily challenges that approval and implicates local concerns. We disagree.

Much like his county road argument, Ferguson's local concern argument overlooks the nature of this dispute. Taylor does not challenge the county's regulatory authority. Nor does he seek to interfere with the county's approval of the Paradise Valley subdivision. Instead, he seeks to compel Ferguson to develop his property in a way that would prevent flooding—and that does not implicate any county action. Of course, the county may impose conditions before granting subdivision approval. But once those conditions are met,

14

the county's local concern has been satisfied; there is no need for further county involvement. And Taylor's request here—that Ferguson install a larger storm-water detention pond—illustrates the point since nothing in the record suggests that would somehow invalidate the county's approval or require it to take some action. We therefore conclude this private-flooding dispute is not a case "necessary to the . . . local concerns" of Pulaski County. It is simply a dispute over "things which the people of a particular community are locally concerned." *Walker*, 291 Ark. at 48, 722 S.W.2d at 561.

Conclusion

Nothing in the record suggests that this case falls within the exclusive jurisdiction of the county courts. It does not involve county roads, internal improvement, or local concerns as those terms are used in our constitution. It is a purely private dispute between neighbors, and as such, it is the kind of case that our constitution says should be adjudicated by an ordinary court. *See* Ark. Const. amend. 80, § 6. The circuit court erred in holding otherwise.

Reversed and remanded.

BAKER, C.J., and WOMACK and WEBB, JJ., concur.


**SHAWN A. WOMACK, Justice, concurring.** "The judicial power is vested in the Judicial Department of state government, consisting of a Supreme Court and other courts established by this Constitution."[1] "Circuit Courts are established as the trial courts of

---

[1]Ark. Const. amend. 80, § 1.

15

original jurisdiction of all justiciable matters not otherwise assigned pursuant to this Constitution."[2] While I join the majority's analysis of article 7, section 28, I write separately to further address more structural issues and the impact of Amendment 80 on cases such as the one before us today.

This case involves common-law tort claims over which the circuit court unmistakably has original jurisdiction. Regardless of what other claims may also be part of the underlying action that, on their own, could have been disposed of by a court inferior to the circuit court, if a complaint states a cause of action that only the circuit court is qualified to handle, then, the entire matter should be heard by the circuit court. In other words, when a complaint is filed with claims that could potentially be within the original jurisdiction of multiple lower tribunals, subject-matter jurisdiction may be consolidated only upwards to the court with the qualifications to hear all of the claims and may never be consolidated downwards to a lower tribunal that is qualified to hear only some of the matters involved but lacks the qualifications or constitutional authority to hear one or more of the underlying claims.

I.    *Discussion*

On appeal, David Taylor correctly argues that the Pulaski County Court lacks subject-matter jurisdiction to adjudicate common-law claims and that article 7, section 28 of the Arkansas Constitution does not otherwise confer such jurisdiction on county courts.[3]

---

[2]Ark. Const. amend. 80, § 6(A).

[3]The majority reverses the order of the issues. In his brief, the appellant first contends that county courts lack subject-matter jurisdiction to adjudicate common-law claims; he

16

A county court presided over by the county judge, the chief executive officer of the county, cannot exercise judicial powers that the Constitution expressly reserves to the state judiciary.

Subject-matter jurisdiction is a *court's* authority to hear a particular type of case. It exists only by virtue of the constitution, constitutionally authorized statutes, or rules adopted under constitutional authority.[4] When resolution requires interpretation of constitutional provisions, as it does here, this court's review is de novo.[5]

The parties advance opposing views of jurisdiction. Taylor contends that the circuit court alone possesses original jurisdiction over his common-law tort claims. Appellees counter that article 7, section 28 vests exclusive original jurisdiction in the county court. Taylor is correct.

A faithful constitutional interpretation begins with the text, read in light of its original public meaning, its historical function, and its subsequent amendments. As Justice Scalia often observed, "[t]he text is the law, and it is the text that must be observed."[6] But the text of the Arkansas Constitution has been amended since 1874. When later amendments change the structure or allocation of power, they necessarily modify earlier provisions to the

---

next argues that article 7, section 28 confers no such jurisdiction. *See* Appellant's Br. 3, 17, 25. In any event, the two arguments are inseparable and should be discussed together.

[4]*See, e.g.*, *Tripcony v. Ark. Sch. for the Deaf*, 2012 Ark. 188, at 4, 403 S.W.3d 559, 561.

[5]*Id.* at 4–5, 403 S.W.3d at 561.

[6]Antonin Scalia & Bryan A. Garner, Reading Law: *The Interpretation of Legal Texts,* 56 (2012).

extent of any conflict.[7]   However, if the provisions can be read in harmony, then it is this

court's duty to do so.[8]

A. *Article 7, section 28*

When Article 7 was ratified in 1874, Arkansas had no unified judicial system.  Instead,

it was fragmented and locally driven.  Courts that existed under this article included a

supreme court, circuit courts, county courts, probate courts, justice of the peace courts,

courts of common pleas, and municipal courts.[9]  As relevant here, article 7, section 28,

granted county courts:

> [E]xclusive original jurisdiction in all matters relating to county taxes, roads,
> bridges, ferries, paupers, bastardy, vagrants, and the disbursement of money
> for county purposes, and in every other case that may be necessary to the
> internal improvement and local concerns of the respective counties.

Under this provision, "county courts" operated as hybrid local tribunals combining

administrative and limited judicial functions.  Even then, one limitation was the county

court's inability to adjudicate common law claims.  This court said as much in 1935.

> The constitutional provision vesting in the county courts jurisdiction of all
> matters relating to county taxes, roads, bridges, etc., does not mean that the
> county court can try all cases that might arise affecting roads and taxes.  Many
> cases may arise and many have arisen where suits had to be brought with
> reference to roads, taxes, bridges, etc., and it has never been contended that
> the county court had jurisdiction to try such cases.  The provision with
> reference to jurisdiction of county courts is somewhat similar to the
> constitutional provision with reference to jurisdiction of probate courts, and

---

[7]*Id.* at 327.

[8]*Ark. Dep't of Fin. & Admin. v. 2600 Holdings, LLC*, 2022 Ark. 140, at 4, 646 S.W.3d 99, 102.

[9]*See* Ark. Const. art. 7.

18

we have said: . . . Probate courts have **no common-law jurisdiction** . . . This is also true as to county courts.[10]

As more fully explained below, the evolution of local government and the emergence of a modern judiciary rendered those mixed roles untenable.

B. *Amendment 80*

Amendment 80, enacted in 2000, consolidated Arkansas's courts into a unified judicial system. It fundamentally reorganized the state's courts. It abolished chancery, probate, and juvenile courts; consolidated their jurisdiction in the circuit courts; and transferred the jurisdiction of multiple municipal and other inferior courts to district courts. Following that reorganization, the state judiciary consists of the Supreme Court, Court of Appeals, circuit courts, and district courts.[11] Judges of these courts must meet strict professional qualifications.[12] These courts and their judges exercise the State's judicial power and are constitutionally authorized to adjudicate justiciable matters.

Amendment 80, section 6 is decisive here. It provides, "Circuit Courts are established as the trial courts of original jurisdiction of *all justiciable matters* not otherwise assigned pursuant to this Constitution."[13] A "justiciable matter" refers to the types of disputes that a *court of law* may properly adjudicate, and cases and controversies involving rights and obligations between parties.

---

[10]*Cnty. Bd. of Election Comm'rs v. Waggoner*, 190 Ark. 341, 346, 78 S.W.2d 821, 823 (1935).

[11]Ark. Const. amend. 80, §§ 1–7.

[12]Ark. Const. amend. 80 § 16.

[13]Ark. Const. amend. 80 § 6(A).

## C. *Application*

The simplest way to illustrate the error of the circuit court in this case is by focusing on the relief Taylor seeks. His complaint requests damages and injunctive relief for flooding allegedly caused by neighboring landowners. Those are classic common-law claims, and a county court lacks constitutional authority to award relief for such claims. If county courts were permitted to resolve private nuisance, negligence, or trespass claims, they would be exercising judicial power outside of the judicial branch which would allow county judges, who need not be lawyers, to adjudicate private legal disputes. Such a result would "task county courts with performing a job they are neither qualified nor authorized to perform."[14] Indeed, that outcome would erode the separation of powers and expand county courts beyond their limited constitutional role.[15]

## II. *Conclusion*

Because Taylor alleged common-law claims for private nuisance, negligence, and trespass, jurisdiction lies exclusively in circuit court. County courts lack the judicial authority to adjudicate such private tort claims. The circuit court therefore erred in dismissing Taylor's complaint for lack of subject-matter jurisdiction.

For these reasons, I respectfully concur.

**BARBARA W. WEBB, Justice, concurring.** This case presents a simple question— whether jurisdiction is proper in the circuit court or the county court. Under amendment

---

[14]*Little Scholars of Ark. Found. v. Pulaski Cnty.*, 2024 Ark. 106, at 13, 689 S.W.3d 428, 435 (Womack, J., dissenting).

[15]*See, e.g.*, *Kimbrough v. Grieve*, 2024 Ark. 34, at 18, 685 S.W.3d 225, 236 (Womack, J., dissenting).

80, section 6 of the Arkansas Constitution, our circuit courts "are established as the trial courts of original jurisdiction of all justiciable matters not otherwise assigned pursuant to this Constitution." However, our county courts "shall have exclusive original jurisdiction in all matters relating to county taxes, roads, bridges . . . and in every other case that may be necessary to the internal improvement and local concerns of the respective counties." Ark. Const. art. 7, § 28.

We have noted that mere "reference to roads, taxes, bridges, etc." is insufficient to invoke the jurisdiction of county courts under article 7, section 28. *Cnty. Bd. of Election Comm'rs v. Waggoner*, 190 Ark. 341, 346, 78 S.W.2d 821, 823 (1935). Such is the case here, where the operative complaint simply references that a county road divides the two private properties at issue. Moreover, the complaint does not challenge any actions taken by the county. And the fact that the allegations arise from events occurring within the county does not mean that "internal improvements" or "local concerns" are at stake. We have held that these terms relate back to the enumerated matters of article 7, section 28. *See Little Rock v. N. Little Rock*, 72 Ark. 195, 204, 79 S.W. 785, 788 (1904) ("[T]he local concerns over which the county court is given exclusive jurisdiction are those which relate specifically to county affairs, such as public roads, bridges, [and] ferries[.]").

Given that no county matters were invoked in Taylor's complaint, the county court lacks jurisdiction. The circuit court erred by dismissing this action for lack of subject–matter jurisdiction.

I concur.

BAKER, C.J., joins.

*D. Franklin Arey III*; and *McMath Woods, P.A.*, by: *Samuel E. Ledbetter* and *David W. Wells*, for appellant.

*Wright, Lindsey & Jennings LLP*, by: *Michael A. Thompson* and *Antwan D. Phillips*, for appellees.