Cite as 2026 Ark. 44

# SUPREME COURT OF ARKANSAS

**No.** CR-24-690

| | |
|---|---|
| CHRISTOPHER COY GAMBLE<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered:** March 5, 2026<br><br>APPEAL FROM THE WHITE COUNTY CIRCUIT COURT [NO. 73CR-20-604]<br><br>HONORABLE MARK PATE, JUDGE<br><br><u>AFFIRMED</u>. |

**BARBARA W. WEBB, Justice**

A White County jury found Christopher Coy Gamble guilty of capital murder by premeditation and deliberation in the killing of Van Stevens, and aggravated residential burglary of Stevens's home. For these crimes, Gamble received a life sentence and a concurrent sixty-year sentence, respectively, in the Arkansas Division of Correction. On appeal, Gamble argues that the circuit court erred by (1) denying his motion to suppress his custodial statement as the product of a pretextual arrest; and (2) denying his motion to strike the venire panel after it heard a venire member say that he was guilty. We affirm.

## I. *General Facts*

On August 17, 2020, Searcy police officers went to Van Stevens's residence for a welfare check. They discovered that Stevens had been brutally murdered—stabbed

thirty-one times and subjected to blunt-force trauma that fractured his skull. In the ensuing investigation, police focused on Gamble as a suspect based on his proximity in time and place to the crime.

Gamble was on parole when he committed the crimes he was charged with. Due to prior interactions with him, the Searcy Police were familiar with Gamble. Gamble's latest encounter with police prior to the murder occurred on August 15, 2020. Officers Christopher Smith and Spenser Dangerfield were dispatched to the local housing authority on a suspicious-person call. The officers made contact with Gamble. As a parolee, Gamble was subject to a search waiver, so Smith and Dangerfield searched the truck Gamble was sitting in and found a pair of black Puma tennis shoes, which Gamble said were his. They also found a knife on the front-passenger seat. Officer Dangerfield searched Gamble's tan Eastport backpack, which contained documents bearing Gamble's name and identifying information, cigarettes, a lightbulb, a sparkplug, and various electrical cords and wires. Gamble complained of medical issues, and the officers called an EMS to transport him to the emergency room and returned his belongings to him. These belongings would later help tie Gamble to the Stevens murder.

Dillion Pritchett, the victim's next-door neighbor, testified that he had a chance meeting with Gamble on the morning of August 17, 2020. They walked together back to Pritchett's house. En route, Gamble stated that he was having mechanical issues with his truck. The two men talked for a couple of hours on Pritchett's front porch and then smoked methamphetamine. Pritchett held himself out as a mechanic and he offered to take a look at Gamble's truck. Pritchett determined that the truck was out of gas and

2

suggested the two men go back to his house until a gas station opened. While walking back to Pritchett's, Gamble noticed a truck similar to his parked in front of Stevens's house. Gamble began "pilfering" in the truck. Pritchett left him and went home. He subsequently went to his brother's house. When he returned, he learned that there had been a fire in his back yard burn pit, and he joined the fire department in determining what had been burned. A zipper from an Eastport backpack, a spark plug, and half a lightbulb were found in the ashes. These items matched the personal property that police had returned to Gamble on August 15. In addition, items of clothing had been burned.

Meanwhile, between 5:30 a.m. and 5:50 a.m., Damon Bratton and Tommy Pratt arrived at work at BBL Oil, which was located next to the Pritchett house at 109 South Oak Street. Shortly after arriving, Bratton saw Gamble walking around outside Pritchett's house, "fidgeting." Gamble then walked over to Stevens's house, went into the alcove of the doorway for about thirty seconds, walked back out of the doorway, and then turned around and went back up to the doorway. When Gamble entered the alcove, Bratton could no longer see him for about ten minutes. Gamble then returned to Pritchett's house and changed clothes. Bratton and Pratt did not see anybody else that morning around Stevens's house. Surveillance footage from BBL Oil's security system corroborated Bratton and Pratt's recollection of events. It also showed Gamble in the back yard of Pritchett's house at 5:36 a.m. Gamble was carrying a gas can and his backpack. Gamble then placed some items on the ground and changed clothes. At approximately 6:25 a.m., a fire could be seen in the area behind Pritchett's house where

3

Gamble had placed the items. Bratton and Pratt's coworker noticed the fire and called 911. The fire department responded around 9:10 a.m. to put the fire out. John Falwell, Captain with the Searcy Fire Department, stated that a knife, some electronics, and some "cloth-type material" were found in the burn pile.

Brandon Lee Reed, who was at Prichett's house from about 1:00 a.m. until 9:00 a.m. the day of the murder, testified that he was "about 80 percent sure" he heard Gamble say, "I shouldn't have killed that man." The State also played Gamble's custodial statement in which he admitted being in the victim's residence sometime before his murder. Gamble claimed he had been insulted when Stevens made a racial slur. Nonetheless, Gamble denied killing him.

Finally, Gamble himself provided evidence of his involvement in the homicide when he was interviewed by police. Gamble unsuccessfully moved to suppress the inculpatory statements he made during this interview.

## II. *The Motion to Suppress*

### A. Issue–Specific Facts

After Stevens was murdered, an unrelated encounter with Searcy police conclusively linked Gamble to the crime. Searcy Police Officer Aaron Smith testified that on the morning of August 18, 2020, he was dispatched to LaQuinta Inn on a "remove a subject call." Upon arrival, he learned that the subject was Gamble. The hotel desk clerk, who had called the police, did not push for Gamble to be arrested— just removed from the premises. As Officer Smith was dealing with Gamble, dispatch called and stated that CID (Criminal Investigation Division) wanted to interview

4

Gamble. Gamble agreed to accompany Officer Smith to the Searcy Police Department headquarters for an interview. The full exchange was captured on Officer Smith's body cam.

Gamble was escorted to an interview room. After receiving and waiving his *Miranda* rights, Gamble admitted to Detective Brian Fritts that he had been inside the victim's residence and that he typically carried a knife. In view of the Searcy police, these admissions gave them probable cause to support an arrest warrant.

Gamble moved to suppress his statement, arguing that it was the product of a pretextual arrest. At a pretrial hearing, the circuit court heard the testimony of Officers Aaron Smith and Corporal Brian Fritts.[1] Officer Smith testified that he had been dispatched to LaQuinta Inn on August 18 to remove Gamble from the premises. When he reported in, he was informed about CID's desire to interview Gamble. Gamble agreed to speak with police. Officer Smith recalled that he searched Gamble twice, first in accordance with standard officer-safety practices and a second time, more thoroughly pursuant to a search waiver that dispatch confirmed was on file. Among other things, Officer Smith found a pipe, which he believed was drug paraphernalia. Officer Smith conceded that he "typically" would arrest a person that was found with drug paraphernalia, but Officer Smith insisted that he did not arrest Gamble at that point. Gamble was not handcuffed when he was taken to the police station. Officer Smith further testified that Gamble was then escorted outside to smoke, after which, he was

---

[1]At the time of his encounter with Gamble, Corporal Fritts was a detective with CID.

formally arrested for the murder of Stevens based on the other detectives' investigation that occurred while Gamble was at the police station.

Corporal Fritts testified that after processing the crime scene, Gamble was developed as a suspect. He informed the patrol division, in person and via email, that CID was interested in speaking with Gamble. However, he denied having any part in detaining Gamble prior to his arrival at the police station. Fritts stated that when the interview began, Gamble was free to leave. During the course of the interview, Fritts assured Gamble that he was not under arrest. Fritts stated that until the ongoing investigation produced additional evidence, and until the admission that Gamble made during the interview had been verified, he did not believe that the police had probable cause to arrest Gamble for Stevens's murder. Fritts concluded the interview, stating, "All right. Mr. Gamble, I appreciate it very, very much. Let's get you out. You do have some property right over here." According to Fritts, at that point, Gamble was free to leave. However, upon exiting the interview room, Fritts met Det. Sergeant Chambliss, and the police decided to detain Gamble in what was referred to as the BAC room. Gamble remained there for more than three hours before he was booked for the murder of Stevens.

In the hearing, Gamble primarily relied on *State v. Sullivan*, 348 Ark. 647, 74 S.W.3d 215 (2002). He argued that he was illegally seized at the motel as the result of a pretextual arrest. Accordingly, the incriminating statements that he made in his interview should be suppressed. He acknowledged the State's claim that he was arrested for possession of drug paraphernalia. However, he asserted that the lack of attention

6

given to the pipe, the statements by Corporal Fritts that he did not care about the pipe, and the fact that he was never charged with possession of drug paraphernalia all prove that his arrest was pretextual. Gamble argued further that the real reason for his detention was that the police wanted to question him about the Stevens homicide. Accordingly, under *Sullivan*, Gamble argued that the pretextual arrest was unlawful under Arkansas law, and his statements were "fruit of the poisonous tree." The circuit court denied Gamble's suppression motion without making any findings.

## B. Argument on Appeal

Gamble argues that the circuit court erred by denying his motion to suppress his custodial statement as the product of a pretextual arrest. He describes this case as a "textbook transgression" of the limits that we have drawn to circumscribe police work and protect Arkansans against pretextual arrests. Further, Gamble asserts that the use of its fruit—his custodial statement—to convict him was not harmless error.

Mirroring his argument to the circuit court, Gamble contends that from the outset of his police encounter the morning he was picked up, it was evident he was wanted for questioning and that he perhaps could have been seized for his activities at the hotel. He notes that Officer Smith admitted he did not tell him he was free to go, told him that he had to come with him to the police station, and that he was not free to leave. The officer also admitted that, while he may have had probable cause to arrest Gamble for a drug- paraphernalia crime, he did not do so. Further, Gamble asserts that Corporal Fritts testified that probable cause to arrest Gamble for murder was not extant until after the interview when warranted searches connected him to the murder.

7

Likewise, Gamble notes that Fritts confirmed that Gamble was not free to leave. Finally, Gamble rejects the idea that the interview was consensual because he was not given a standard form based on Arkansas Rule of Criminal Procedure 2.3 advising him that he was free to decline a request for a police interview.

The State responds that it was *not* a pretextual arrest because as Gamble concedes, he was not arrested on any charge— "The officer also admitted that, while he may have had probable cause to arrest Gamble for a drug-paraphernalia crime, he did not do so." It contends that because there was no arrest for any crime, any arrest that may have occurred was not pretextual. In the alternative, the State asserts that the exclusionary rule does not apply. Notably, the State did not ask to overrule *Sullivan*.

## C. Standard of Review

When we review the denial of a motion to suppress, we conduct a de novo review based on the totality of the circumstances. We reverse the circuit court's decision only if the ruling is clearly against the preponderance of the evidence. *Scarbrough v. State*, 2024 Ark. 71, at 12, 687 S.W.3d 557, 565.

## D. Supplemental Briefing

When this case was first submitted *State v. Sullivan* was the relevant precedent. It became clear that the application of *Sullivan* was necessary to address the pretextual-arrest issue. However, we asked for supplemental briefing on whether we should overrule *Sullivan* and bring Arkansas in line with other states.[2]

---

[2]While we respect the dissent's position, we must disagree. As noted, our review of Gamble's argument challenging the circuit court's denial of his motion to dismiss is de novo. Accordingly, our decision is proper for several reasons. First, "[w]hen an issue

8

In his supplemental brief, Gamble asserts three points in urging us not to overrule

*Sullivan:*

> (1)    The parties have not asked the Court to revisit the decision. Ordinarily the Court does not decide non–jurisdictional issues the parties have not asked it to decide by preservation below or adequate briefing on appeal.

> (2)    Stare decisis and the Court's strong public policy preference to uphold prior decisions for predictability and stability, even in the face of parties' requests to overrule them, govern here.

> (3)    *State v. Sullivan* was rightly decided as a matter of state constitutional law.

Because we decide that *Sullivan* was incorrectly decided as a matter of state constitutional law, we overrule *State v. Sullivan*.

---

or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties. Rather, the court retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). The issue of whether the arrest is unreasonable is clearly before us. Accordingly, we are not constrained to view the arrest in this case as unreasonable simply because, before we ordered supplemental briefing, the parties agreed to it. Second, nothing about the court's decision to address this issue is extraordinary. Some of the most prominent Supreme Court decisions have involved overturning precedent that was not directly challenged on appeal. *See, e.g., Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Mapp v. Ohio*, 367 U.S. 643 (1961); *Washington v. Davis*, 426 U.S. 229, 238 (1976); and *Younger v. Harris*, 401 U.S. 37, 40–41 (1971), were each decided without briefing or argument. Third, the dissent's reliance on *Sineneng-Smith* is entirely misplaced. *Smith* concerned the Ninth Circuit's decision to sua sponte raise an overbreadth challenge to a validly enacted statute. Overbreadth challenges have been described as strong medicine and invalidation of a legislative provision concerns separation–of–powers issues. That is why the Ninth Circuit's actions went beyond a "modest initiating role" that changed the entire nature of the litigation. That's not the case here; we are simply determining whether Gamble's arrest was permissible under our constitution.

Sullivan was charged with possession of methamphetamine with intent to deliver. The Faulkner County Circuit Court granted defendant's motion to suppress. The State appealed. This court affirmed. *State v. Sullivan*, 340 Ark. 315, 11 S.W.3d 526 (*Sullivan I*) (2000). In that decision, which was argued exclusively on violation-of-Fourth Amendment grounds, the court relied on *United State v. Lefkowitz*, 285 U.S. 452, 467 (1932), a case in which the Supreme Court held that "an arrest may not be used as a pretext to search for evidence."

The State petitioned for rehearing and argued for the first time that the court's analysis regarding the concept of "pretext" is contrary to the United States Supreme Court's opinion in *Whren v. United States*, 517 U.S. 806 (1996). Nonetheless, the court again affirmed and issued a supplemental opinion. *State v. Sullivan*, 340 Ark. 318–A, 16 S.W.3d 551 (2000) (*Sullivan II*). In *Sullivan II*, a majority of the court expressed that *Whren* did not proscribe the circuit court's finding that "the arrest was pretextual and made for the purpose of searching Sullivan's vehicle for evidence of a crime," and "even if we were to interpret *Whren* to give full rein to law enforcement to effect pretextual arrests for traffic violations, there is nothing that prevents this court from interpreting the United States Constitution more broadly than the United States Supreme Court, which has the effect of providing more rights." *Id*.

The State petitioned for a writ of certiorari, which the United States Supreme Court granted. It vacated the mandate in *Sullivan II* and remanded the case for further proceedings. *Arkansas v. Sullivan*, 532 U.S. 769 (2001). The Supreme Court held that (1) any improper subjective motivation of police officer for stopping defendant's vehicle

did not render arrest violative of Fourth Amendment, and (2) this court could not inquire into arresting officer's subjective motivation on theory that it could interpret United States Constitution more broadly than the Supreme Court.

In so doing, the *Sullivan* court abandoned Arkansas's strong commitment to using reasonableness analysis in evaluating police conduct with regard to searches and seizures. But that reasonableness analysis is compelled by the text of our constitution. Like the Fourth Amendment, article 2, section 15 turns on reasonableness. Ark. Const. art. 2, § 15. Underscoring this point, earlier versions of the Arkansas constitution did not mirror its federal counterpart. *See* Ark. Const. of 1864, art. 1, § 9 (general warrants . . . are dangerous to liberty and shall not be granted). So, when we adopted our current version of article 2, section 15—a form nearly identical to the Fourth Amendment—it suggested that the people wished to adopt a standard in-line with the protections provided by the federal constitution. *See Knight v. State*, 171 Ark. 882, 286 S.W. 1013, 1015 (1926).

Despite this, the *Sullivan* court never considered any history that might show the people of Arkansas viewed pretextual arrests as uniquely unreasonable. Far from it, the decision was grounded in the bald assertion that the court "ha[d] traditionally viewed [this] issue differently than the federal courts." *Sullivan* 384 Ark. at 652, 74 S.W.3d at 218. In conducting its analysis, however, the court cited cases from the 1970s and 1980s—nearly a century after our constitution was adopted. That is not how we read constitutional provisions. *Taylor v. Ferguson*, 2025 Ark. 180, at 8, 722 S.W.3d 498, 503 (noting that constitutional provisions must be understood as they would at the time of

11

their adoption).

So, while this court previously claimed that pretextual arrests "are unreasonable police conduct warranting application of the exclusionary rule[,]" *Sullivan*, 348 Ark. at 656, 74 S.W.3d at 221, such an assertion is wrong. It is not unreasonable to arrest someone for a lesser crime (when there is probable cause for that arrest) if the real motivation of the police is to investigate a more serious crime. This is the Supreme Court's take on the Fourth Amendment's reasonableness requirement and that of all but one other state. *Whren*, 517 U.S. at 819. The officer's subjective intent for making the arrest is irrelevant if there is probable cause for that arrest. *See, e.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 403 (2019). In fact, it is objectively *un*reasonable to not let police arrest a murder suspect for a lesser crime just because the police do not yet have probable cause to make an arrest for murder.

Moreover, *Sullivan* replaced the simplicity of examining the objective reasonableness of an arrest based on probable cause with an examination of the mindset of the arresting officer. That created a regime of "arbitrarily variable protection." *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004). Where experienced officers could act constitutionally by concealing their subjective reasons for arrest and quickly identifying charges with probable cause, inexperienced officers under the exact same circumstances could be acting unconstitutionally. *See id*. We cannot endorse a view of our constitution that "can be made to turn upon such trivialities." *Whren*, 517 U.S. at 815.

As this court recently explained, stare decisis has no value in cases where a prior decision is "subordinate to legal reason and justice." *State v. Good Day Farm Ark., LLC*,

12

2025 Ark. 207, at 14. "The true irony of our modern stare decisis doctrine lies in the fact that proponents of stare decisis tend to invoke it most fervently when the precedent at issue is least defensible." *Gamble v. United States*, 587 U.S. 678, 724–25 (2019) (Thomas, J., concurring). That is the case here, and we will "not invoke stare decisis to uphold precedents that are demonstrably erroneous." *Id.* at 726 (Thomas, J., concurring). Put another way, "demonstrably erroneous decisions—meaning decisions outside the realm of permissible interpretation—" cannot take precedence "over the text of the Constitution[.]" *Id.* at 711.

But overruling *Sullivan III* does not relieve us of our duty to review Gamble's motion to suppress. In our de novo review, we look to our rules of criminal procedure. Under Rule 4.1(a)(iii), "A law enforcement officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed . . . any violation of law in the officer's presence. Gamble's possession of drug paraphernalia was an offense that was committed in Officer Smith's presence. Accordingly, Gamble's arrest was proper, and we affirm the circuit court's denial of his motion to dismiss.

III. *Gamble's Motion to Strike the Venire*

A. Issue-Specific Facts

During voir dire, when asked whether any of the jurors knew any of the witnesses, the following exchange took place:

| | |
|---|---|
| MS. LEVINE: | I'm related to – to the witnesses Chris Smith and Tim Smith. I also know Dustin Pritcher, and I also know Brian Fritz. |
| THE COURT: | All right, does that – does that relationship -- would that make you more likely to believe |

13

|               |                                                              |
| ------------- | ------------------------------------------------------------ |
|               | them as witnesses?                                           |
| MS. LEVINE:   | I know about the case as well.                               |
| THE COURT:    | – and as a result, you don't think that you could be fairly impartial. |
| MS. LEVINE:   | No, sir. I think he's guilty to be honest.                   |
| THE COURT:    | Ma'am, going to excuse you for cause, Ms. Levine.            |

Gamble's trial counsel argued that the disclosure by venireperson Levine tainted the potential jurors and asked that the entire venire be struck. The circuit court entertained extensive arguments by both sides. Further, the court offered to allow the defense to inquire of each potential juror whether Ms. Levine's statement affected their objectivity. The defense declined the offer. Back in session, after considering further arguments of counsel, the court circuit gave the following admonition:

All right, ladies and gentlemen, you have not been presented the evidence in this case, you've not heard from the witnesses in this case, you've not seen the evidence in this case. The statement made by that lady earlier was based on her opinion. It was not based in the law as given by me, and it was not based on the evidence that will be provided in this case. Her opinion has no merit whatsoever in this case. You are to disregard that comment and her opinion. If you're chosen as a juror, you will base your opinion on the evidence that is presented in court and from the witnesses that testify.

## B. Standard of Review

A trial court's refusal to quash a jury panel is reviewed for an abuse of discretion. *Gwathney v. State*, 2009 Ark. 544, at 5-6, 381 S.W.3d 744, 747-48. Irregularities

affecting the selection of the jury panel warrant a new trial only if timely objection was made prior to the verdict and the resulting prejudice is shown. *Id*. Generally an abuse occurs when the circuit court acts improvidently, thoughtlessly, or without due consideration. *Walker v. State*, 2025 Ark. 127, 719 S.W.3d 450.

### C. Argument on Appeal

Gamble argues that the prejudice engendered by Ms. Levine's nonresponsive answer in voir dire could not be cured by an admonition. We disagree. Persons comprising the venire are presumed to be unbiased and qualified to serve. *Goins v. State*, 318 Ark. 689, 701, 890 S.W.2d 602, 608 (1995). The circuit court did not act thoughtlessly or without due consideration. Quite the contrary. It worked diligently to make sure that unfair prejudice did not infect the petit jury that was impaneled. After Ms. Levine's statement, the circuit judge explored options for limiting exposure of venirepersons to potentially prejudicial comments. Finally, it gave a comprehensive admonishment to the entire remaining jury pool. Accordingly, we affirm on this point as well.

Affirmed.

BAKER, C.J., and HUDSON, J., dissent.

**COURTNEY RAE HUDSON, Justice, dissenting.** This case represents a fundamental shift in Arkansas jurisprudence. Historically, this court has been resolute in holding that we will not make an argument for a party or raise an issue *sua sponte* unless it involves the trial court's jurisdiction. *See, e.g., City of Little Rock v. Cir. Ct. of Pulaski*

15

*Cnty.*, 2017 Ark. 219, at 6 n.5, 521 S.W.3d 113, 117 n.5; *Sullivan v. State*, 2012 Ark. 178, at 5; *Hanlin v. State*, 356 Ark. 516, 529, 157 S.W.3d 181, 189 (2004); *Stiles v. Hopkins*, 282 Ark. 207, 666 S.W.2d 703 (1984). Here, it was the majority—not the parties—that raised the prospect of overruling *State v. Sullivan*, 348 Ark. 647, 74 S.W.3d 215 (2002) (*Sullivan III*).

When this case was first submitted to the court nearly a year ago, Gamble presented two points on appeal: (1) the circuit court erred in denying his motion to suppress his custodial statement as the product of a pretextual arrest, and the error was not harmless beyond a reasonable doubt; and (2) the circuit court erred by denying his motion to strike the venire panel after it heard a venire member say that Gamble was guilty. In response to the first point, the State argued that Gamble's arrest was not pretextual;[1] that even if a pretextual arrest had occurred, the exclusionary rule should not apply because attenuating circumstances rendered Gamble's statement an act of free will; and finally, that any error in denying Gamble's motion to suppress was harmless beyond a reasonable doubt. In no way, shape, or form did the State argue that *Sullivan III* should be overruled—likely because the State knew that the argument had not been raised below and because *Sullivan III* has been recognized as a workable standard with narrow application for years. *See, e.g., Echols v. State*, 2015 Ark. App. 304, 462 S.W.3d 352 (affirming denial of motion to suppress when defendant was arrested on outstanding

---

[1]The State recognized that *Sullivan III* was the controlling law and argued that "[b]ecause there was no arrest for any crime, any arrest that may have occurred was not pretextual." (Appellee's brief at 15.)

misdemeanor arrest warrant with dual motive of questioning him about a robbery); *Henley v. State*, 95 Ark. App. 108, 234 S.W.3d 316 (2006) (holding that evidence seized from the defendant's home following a purely pretextual arrest must be suppressed). Yet a majority of this court was determined to overrule *Sullivan III*. So, instead of deciding the appeal based on the arguments presented by the parties, the majority *sua sponte* ordered supplemental briefing "on the issue of whether this court should revisit [its] decision in *State v. Sullivan*, 348 Ark. 647, 74 S.W.3d 215 (2002)."[2]

Unsurprisingly, the State then shifted its position in supplemental briefing to argue vigorously that *Sullivan III* should be overruled. And why wouldn't it? In ordering supplemental briefing, the majority sent a not-so-subtle signal of its willingness to overturn or "revisit" this court's decision in *Sullivan III*. The State's able lawyers responded exactly as expected.

Several problems exist with the majority's approach. First, we are appellate judges, not advocates or activists. "A fundamental proposition of appellate procedure is that the parties raise the issues and the court decides them." *Evans v. Harrison*, 2025 Ark. 164, at 11, 721 S.W.3d 753, 760 (Wood, J., dissenting). This is known as the party-presentation principle. In *Evans*, the majority reversed the circuit court by finding facts

---

[2]Until recently, supplemental briefing typically has been reserved for those rare instances in which there had been an intervening change in the law after briefing was complete. *E.g.*, *Walther v. FLIS Enters., Inc.*, 2018 Ark. 64, 540 S.W.3d 264 (noting that this court ordered supplemental briefing on the impact of this court's sea change sovereign-immunity decision in *Board of Trustees v. Andrews*, 2018 Ark. 12, 535 S.W.3d 616); *Ark. Dep't of Corr. v. Williams*, 2009 Ark. 282, 308 S.W.3d 609 (granting a motion for supplemental briefing following the passage of Act 1296 of 2009 regarding lethal-injection protocol, which purported to resolve the issues presented in the pending appeal).

absent from the record based on a legal theory that neither party raised either below or on appeal, prompting a critical dissent, which I joined. The *Evans* dissent recognized the dangers and the inefficiency of this court ordering supplemental briefing rather than addressing the arguments presented by the parties.

The Supreme Court of the United States has explained the party-presentation principle as follows:

> In our adversarial system of adjudication, we follow the principle of party presentation. As this Court stated in *Greenlaw v. United States*, 554 U.S. 237, 128 S. Ct. 2559, 171 L.Ed.2d 399 (2008), "in both civil and criminal cases, in the first instance and on appeal . . ., we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.*, at 243, 128 S. Ct. 2559. In criminal cases, departures from the party presentation principle have usually occurred "to protect a pro se litigant's rights." *Id.*, at 244, 128 S. Ct. 2559; *see, e.g.*, *Castro v. United States*, 540 U.S. 375, 381–383, 124 S. Ct. 786, 157 L.Ed.2d 778 (2003) (affirming courts' authority to recast pro se litigants' motions to "avoid an unnecessary dismissal" or "inappropriately stringent application of formal labeling requirements, or to create a better correspondence between the substance of a pro se motion's claim and its underlying legal basis" (citation omitted)). But as a general rule, our system "is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Id.*, at 386, 124 S. Ct. 786 (Scalia, J., concurring in part and concurring in judgment).
>
> In short: "[C]ourts are essentially passive instruments of government." *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in denial of reh'g en banc). They "do not, or should not, sally forth each day looking for wrongs to right. [They] wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties." *Ibid.*

*United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020).[3] The Court went on to note that the party-presentation principle is "not ironclad" and that there are

---

[3]In *Sineneng-Smith*, the Court vacated the Ninth Circuit's judgment and remanded for reconsideration "shorn of the overbreadth inquiry interjected by the

circumstances in which a "modest initiating role for a court is appropriate." *Id.* at 376. This is not such a case, however, nor is the initiating role of the majority here "modest." In short, no extraordinary circumstances justified the majority's takeover of this appeal.

Next, it is important to note that this is a criminal appeal. It is not only a slippery slope from *Evans* in a civil context to the criminal case at bar, but it is also one with a spiraling downward trajectory. It is even more egregious in a criminal setting to abandon our neutral-arbiter role in which we decide the issues presented by the parties. Justice demands an even playing field in which the referees do not move the goal posts during the game. In many instances, the State already has more tools in its arsenal than does the Arkansas Public Defender Commission, which represents Gamble. For example, public defenders in Arkansas have long been overloaded with cases. *See* Arkansas Advisory Committee to the U.S. Commission on Civil Rights, Report Brief, April 2025, https://www.usccr.gov/files/2025-04/report-brief_right-to-counsel-in-arkansas-2024.pdf. What's more, I cannot foresee this majority ever making an argument on behalf of a criminal defendant and then ordering rebriefing to bolster a defendant's chances on appeal.

Only a few months ago, I joined the *Evans* dissent, which offered laudable reasons for refusing to participate in the judicial activism of the majority. The error in *Evans* has now been expanded to the criminal realm, where a person's most fundamental liberty is at stake. By upending the most basic practices of fairness and objectivity, the

---

appellate panel and bearing a fair resemblance to the case shaped by the parties." 590 U.S. at 379.

majority has transformed a once neutral arbiter into legal counsel for the State, which is staffed with attorneys who are experts in criminal law.

All our precedents are now at the mercy of the whims of a majority of this court without regard to the arguments presented by the parties. I will not participate in cherry-picking which precedents to follow based on whether I personally agree with them or like the outcome they prescribe. Finally, I take no position on whether I would vote to overrule *Sullivan III* because the argument is not properly before us. For these reasons, I respectfully dissent.

BAKER, C.J., joins.

*David R. Raupp*, Arkansas Public Defender Commission, for appellant.

*Tim Griffin*, Att'y Gen., by: *Walker K. Hawkins*, Ass't Att'y Gen., for appellee.